Joseph J. Tabacco, Jr. (SBN 75484)
Kristin J. Moody (SBN 206326)
A. Chowning Poppler (SBN 272870)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Email: jtabacco@bermantabacco.com
       kmoody@bermantabacco.com
       cpoppler@bermantabacco.com

*Local Counsel for Plaintiff and the Proposed Class*

Patricia I. Avery (*pro hac vice* to be filed)
Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone:  (212) 759-4600
Email: pavery@wolfpopper.com
       pblack@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH COPLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATERA, INC.<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); and**<br><br>2. **VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code 1750, §§ *et seq.*); and**<br><br>3. **BREACH OF IMPLIED CONTRACT OR QUASI-CONTRACT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff Elizabeth Copley ("Plaintiff" or "Copley"), individually and on behalf of all others similarly situated, brings this action against Natera, Inc. ("Natera" or "Defendant"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

**INTRODUCTION**

1. Plaintiff brings this class action on behalf of a nationwide class comprised of all persons in the United States who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that test.

2. Patients across the country are being harassed by Natera's deceptive and fraudulent billing practices relating to the genetic testing services that the company offers. Natera, a genetic testing company, offers, *inter alia*, a whole range of genetic tests to women who are trying to conceive (carrier screening genetic tests that screen prospective parents for any genetic defects) or pregnant (pre-natal genetic tests that analyze the DNA from the pregnant mother's placenta to look for certain chromosome conditions that could affect the baby's health). Natera brochures represent to patients that they will be charged no more than $249.

3. Despite these representations, thousands of women have ended up with bills from Natera running into thousands of dollars, leaving them shocked, angry, and stressed because they had no idea they were signing up for such an expensive service. Had they known, they may have opted out of genetic tests such as these that are not considered "life-saving."

4. Natera's actions are central to deceiving patients about the amount it charges for its tests. First, Natera does not disclose the full charge for a test in any of its advertising materials or other channels of marketing such as through physician offices or fertility clinics. This is in stark contrast to Natera's boastful claims on its website that it offers price transparency. Second, Natera deceives patients by advertising a Price Transparency Program that it clearly fails to adhere to. It tells patients that once insurance information is provided, it "generates an insurance estimate"; and "if [it] estimates your cost to exceed [its] cash price, [it will] contact you via text or email and you choose how you pay: insurance or cash." Natera does not do this. Natera simply runs the tests through insurance and bills patients the amount determined by the insurance as

patient responsibility. The amounts billed can vary from $0 to thousands of dollars, leaving patients with absolutely no insight into the amount they could end up being charged. Third, Natera misrepresents to its patients through its brochures and other channels of marketing such as physician offices or fertility clinics that the out-of-pocket expense for patients would not exceed $249.

5. By its above conduct of misrepresentations and omissions, Defendant causes a substantial financial burden on new, expecting, and prospective parents. When patients receive enormous bills, often several months after the date of service, they are outraged and try to get in touch with Natera to inquire about the issue. But even then Natera makes their life difficult by being hard to get in touch with. Many patients give up after trying to call or email Natera a few times, and end up paying the exorbitant bills. Patients who are persistent and manage to reach Natera are sometimes offered discounts, whereby Natera offers to waive any charges above $249 if the patient pays within a limited time window—a high-pressure tactic that is designed to fraudulently extract as much money as possible from patients.

6. As testament to Natera's egregious billing practices, online platforms such as Yelp, Better Business Bureau, Reddit, and pregnancy forums such as whattoexpect.com are exploding with negative reviews on Natera's billing practices. For example, Better Business Bureau has 313 complaints in the last three years, 228 of which are related to "Billings/Collection"; Yelp has 186 reviews, a majority of which are negative reviews that give the company a "1 star" rating. Similarly, a Reddit thread titled "How is this not fraud? – Natera bill" has 101 comments with people narrating their horror experiences with Natera's billing practices, and whattoexpect.com contains several discussion threads titled "Natera is a terrible company"; "Beware Natera Billing!"; "Natera Billing issues" "Natera genetic testing bill $8000?!".

7. Plaintiff, pregnant with her second child, did Natera's Panorama test after her physician recommended it. She was assured by her physician that the test would not cost more than "a couple hundred dollars." Almost twenty-two months after the date of service, Plaintiff noticed a charge of $8,000 on her Explanation of Benefits statement. Shocked, her husband

1  inquired from their insurance provider Connecticare and also from Natera. Natera told them that
2  if they agreed to pay $249 on the call, Natera would write off the rest of the charges. Almost a
3  month later, Plaintiff received a bill from Natera for $721.10 (the amount her insurance
4  ascertained as her responsibility). A few weeks later, she received a second bill from Natera
5  asking her to pay $721.10. After making one payment of $50 to Natera under protest, Copley later
6  received a third bill dated October 24, 2021 for $671.10, due immediately.

7        8.      Defendant's conduct with respect to billing for its genetic tests violates the
8  California Unfair Competition Law ("UCL"), the California Consumer Legal Remedies Act
9  ("CLRA"), and common law, which provides that in the absence of an express contract, service
10 providers are entitled to the reasonable value of the services rendered.

## PARTIES

12       9.      Plaintiff, Elizabeth Copley ("Copley"), is an individual and a resident of
13 Connecticut.

14       10.      Defendant Natera, Inc. is incorporated in Delaware and has its principal place of
15 business at 201 Industrial Road, Suite 410, San Carlos, California 94070. Defendant is a
16 diagnostic company that provides preconception and prenatal genetic testing services.

## JURISDICTION AND VENUE

18       11.      This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C
19 §1332, in that the matter in controversy exceeds the sum or value of $1 million, exclusive of
20 interest and costs; it is a class action of more than 100 potential class members; and more than
21 two-thirds of the class members reside in states other than the state in which Defendant is a
22 citizen.

23       12.      This Court has personal jurisdiction over Defendant because it is headquartered in
24 California, has its principal place of business in California, and a substantial portion of the acts
25 complained of took place in California. Natera sends out its bills from a California address, viz.
26 "PO Box 299023, San Francisco CA 94139-9023" and in the year ended December 31, 2020, it
27 processed most of its tests in its San Carlos, California laboratory (*see* Natera's 2020 Form 10-K,

retrieved from www.investor.natera.com/, last accessed September 13, 2021); and it uses its San Carlos, California address on the Panorama and Horizon tests brochure.

13. Venue properly lies in this district pursuant to 28 U.S.C. §1391 because Defendant is headquartered in this district, has transacted substantial business within this district within the meaning of 28 U.S.C. §1391, and because a substantial part of the events giving rise to the claims alleged herein occurred in this District.

## INTRADISTRICT ASSIGNMENT

14. Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Francisco Division of this district is proper because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in San Mateo County, California, and Defendant's principal place of business is located in San Mateo County, California.

## FACTUAL ALLEGATIONS

15. Natera specializes in providing genetic tests for pregnant women and women who wish to become pregnant. It offers several genetic testing panels called Panorama, Horizon, Vistara and Spectrum. The Horizon and Panorama panels contribute a significant portion of the company's revenues.

16. Natera operates laboratories in Austin, Texas and San Carlos, California, both of which perform the Panorama and Horizon tests. Specimens from New York are tested only at the California laboratory since it is the only Natera laboratory approved by the New York State Department of Health. Natera's 2020 10-K dated February 25, 2021, reported that, in 2020, it had processed the greatest number of tests in its CLIA-certified laboratory in California.

**Natera's Billing Policy**

17. Natera's billing policy and practices are deceptive, unfair and misleading. Natera charges patients thousands of dollars while entirely concealing price information for its genetic tests, which is crucial to patients' decision making. By employing a marketing and billing policy that is erratic and designed to deceive, Natera misleads thousands of pregnant or trying-to-

conceive patients by failing to accurately disseminate crucial price information to patients and making false and/or misleading statements in marketing materials.

Failure to disseminate crucial price information

18. First, Natera fails to ensure that every patient is made aware of its billing practices. As a common theme, Natera fails to forewarn patients of the extremely high price it charges for its genetic tests and the fact that many insurance plans do not cover these tests.

19. Second, even in cases where Natera provides patients with its billing policy, Natera nevertheless conceals the full price for the genetic tests. For example, Natera does not tell patients that the charge for a Panorama test is an astounding $8,000. Where patients have not met their deductible or where their insurance denies coverage, the $8,000 or the amount above the amount the insurance "allows" (which is often more than $500) becomes the patient's responsibility. Moreover, given that genetic testing still remains a fairly new area of medical science and is not covered by some insurance plans, disclosure of the full charge for the tests is especially crucial for patient decision making.

Natera's billing policy is misleading

20. Natera's website, brochure and other marketing materials that purport to provide billing and pricing information are misleading and conceal crucial information, the disclosure of which could potentially affect a patient's decision to do the test.

21. On the "Pricing and Billing Information" page under the Women's Health category on Natera's website, www.natera.com/womens-health/pricing-billing/, Natera boasts of offering "access programs and price transparency – rooted in [their] commitment to provide affordable testing for all who can benefit." Quite contrary to this "commitment," Natera's pricing page fails to transparently disclose any prices for their genetic tests. Instead, Natera makes false claims of providing "clear cost estimates for patients." Natera describes its "Price Transparency Program," to include four steps, viz.:

 

Medical provider orders a test. We start processing the patient sample.       We generate an insurance estimate

 

If we estimate your cost to exceed our cash price, We'll contact you via text or email and you choose how you pay: insurance or cash.       If you choose insurance, we'll send you a bill once your health plan confirms exactly how much you owe.

*Source: https://www.natera.com/womens-health/pricing-billing/ (last accessed September 13, 2021)*

22. Unfortunately, in practice, Natera does not follow these steps, particularly Step 2: "We generate an insurance estimate"; and Step 3: "If we estimate your cost to exceed our cash price, we'll contact you via text or email and you choose how you pay insurance or cash." In practice, Natera neither runs insurance estimates for patients prior to billing nor contacts patients to give them an option to pay through insurance or cash, but rather surprises patients with huge bills, causing them shock and distress.

23. For example, one review on Yelp states:

> I recently completed the Natera Horizon Carrier screen through Natera. The test was billed as costing $349 without insurance on the website. The Natera website clearly states that they will contact you if the test's cost exceed this price once they take your insurance into account. I was surprised, therefore, to receive a bill for $841.81 once my insurance had been billed. …

https://www.yelp.com/biz/natera-san-carlos/ (last accessed March 18, 2021).

24. Further, Natera's Panorama / Horizon Patient Brochure, available at www.natera.com/resource-library/, misleadingly responds to the question "How much are Horizon and Panorama? Are they covered by insurance?", by, *inter alia*, stating:

> Based on previously approved claims data, the majority of patients have an out-of- pocket expense between $100 and $200 for each test, once their deductible has been met.*

CLASS ACTION COMPLAINT                                                                                                          6

*Based on previously approved claims from 2016 to 2017. Some patients will owe more, many will owe less.

https://www.natera.com/wp-content/uploads/2021/02/Panorama-Horizon-Patient-Brochure.pdf (last accessed Sept. 13, 2021). This statement gives patients a false sense of comfort that their out of pocket expenses would not be more than $200. Disclaimers in vague fine print or caveats involving technical medical insurance terminology that is little understood by patients does not absolve Natera from its responsibility to be transparent about the price of its genetic tests. In fact, as narrated in the anecdotes below, physicians themselves were under the impression that patients would not owe anything more than $100-200 for a test and conveyed it to the patients.

25. Another Natera brochure pertaining to the genetic panels titled "Natera Billing Policy$^{TM}$" provides, *inter alia*, that Natera is "in network with most insurance plans including: 1. HMO & PPO 2. Medicaid 3. Tricare 4. HAS's and FSA's and 5. Compassionate Care Program available for unemployed and low income"; and "the average out-of-pocket cost is between $100-249." There is no mention of the full price that Natera may charge for its tests, and patients are left expecting to pay not more than $249.

26. In addition, Natera will also bill ***in-network*** patients exorbitant and improper charges. In these bills, Natera misleadingly claims that the patient's insurance did not cover the test, when in reality, it is Natera that failed to obtain required pre-authorization from the insurers. Consequently, patients who should owe nothing for the test, or only a co-pay, are hit with a surprise bill stating that they owe much more than what they expected.

27. Natera is aware of its obligation to obtain pre-authorization, but intentionally or recklessly does not obtain that pre-authorization. Natera's practice of billing in-network patients is an attempt to circumvent its pre-authorization obligations with insurers by improperly and fraudulently obtaining payment directly from patients.

**Experiences with Natera's Billing Policy**

Plaintiff Elizabeth Copley

28. In late 2019, when Copley was pregnant with her second child, Copley's physician advised her to do the Natera Panorama$^{TM}$ Non-Invasive Prenatal Testing panel ("Panorama

panel") due to her age. Upon specifically inquiring how much the test would cost, Copley was assured that it would not be more than "a couple hundred dollars." On that assurance, she agreed to get her blood drawn for the "Panorama Prenatal Screen with Microdeletions" panel (procedure codes: Fetal Chromosomal Aneuploidy with Microdeletions 81420HA, 81422HA) on October 22, 2019. There was no discussion between her doctor and her on whether she wanted to run the test through insurance or self-pay; her doctor's clinic had her insurance details and, just like her other bloodwork, the Natera test was also run through her insurance.

29. Copley did not hear anything further about or from Natera until she noticed a charge of $8,000 on her Explanation of Benefits ("EOB") statement. The EOB was for the plan year 01/01/2019 to 12/31/2019. Natera had billed Copley's insurance, Connecticare, $3,900 for Pathology services and $4,100 for Laboratory services in connection with the Panorama panel. Connecticare denied the claim entirely, transferring potentially the entire charge onto Plaintiff. Copley was shocked to see these exorbitant charges and the fact that the entire charge could potentially become her responsibility. Her husband, Charles Copley, called Connecticare inquiring about the charge. Connecticare advised him to call Natera.

30. Charles Copley then called Natera inquiring about the charge. He informed them that he and his wife were completely unaware that they could be charged thousands of dollars for the Panorama panel, a situation vastly different from what Copley had understood about the cost of the test. The Natera representative responded saying that if they agreed to pay off the bill instantly, Natera would accept a payment of $249 and waive the rest of the charges. With no other option in sight, Charles Copley agreed to pay $249 on the phone using his credit card and requested the representative for a receipt of payment.

31. However, Copley received a bill dated July 9, 2021 for $721.10 from Natera for the very same test. The bill was due on August 8, 2021.  Copley then received a second bill dated August 16, 2021 for $721.10, due upon receipt. Copley made one payment of $50 to Natera, noting on the check that it was paid under protest. Copley later received a third bill dated October 24, 2021 for $671.10, due immediately.

<u>Other experiences</u>

32. Just like Plaintiff, there have been hundreds, if not thousands, of women who have had similar horrific experiences with Natera. Yelp, BBB, Reddit, and pregnancy forums such as whattoexpect.com are filled with negative experiences by patients who have been traumatized by Defendant's deceptive and fraudulent billing practices which include:

    a. Concealing the price of a Natera genetic test;

    b. Surprise balance billing patients after recovering a portion from third-party payors (i.e. insurance companies);

    c. Misleading patients about their out-of-pocket costs for a Natera genetic test;

    d. Making false statements regarding Natera's Price Transparency Program; and

    e. Harassing patients by repeatedly sending bills even after they have paid Natera's "prompt pay" discount in exchange for the rest of charges being waived.

33. For example, one Yelp reviewer said the following regarding Natera's billing practices:

> My OB told me that the total cost is about $250. But the bills I received is much higher than I expected. I think this company tries to take advan[tage] of new parents who care about their coming kids. Disgusting!!!

https://www.yelp.com/biz/natera-san-carlos (last accessed Oct. 27, 2021).

34. On Natera's Better Business Bureau Profile, patients' experiences are no different:

> We were told by our fertility clinic for genetic testing out of pocket cost would be $200 each test which we had 2 done mine and my spouse. We were given a paper with this information and told the genetic testing company would contact us once talking to our insurance and [if] it was more than $200 we could do the self pay option. Nobody ever contacted us and they billed each of our insurance over $14,000 and now insurance is stating we owe an upward of $7000. Nobody ever contacted us to tell us this and offer us the self pay option……

https://www.bbb.org/us/ca/san-carlos/profile/laboratory-research/natera-1116-537368/complaints (last accessed Oct. 27, 2021).

**CLASS ACTION ALLEGATIONS**

35. Plaintiff brings this suit as a class action on behalf of herself and all other similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2) and/or 23(b)(3).

CLASS ACTION COMPLAINT         9

36. Plaintiff seeks to represent a nationwide class comprising of all persons in the United States who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that test (the "Class").

37. Upon completion of discovery with respect to scope of the Class, Plaintiff reserves the right to amend the Class definition. Excluded from the Class are Defendant, its parents, subsidiaries and affiliates, directors and officers, and members of their immediate families.

38. The members of the Class are so numerous that the joinder is impracticable. It is believed that at a minimum, thousands of persons across the United States got a Natera genetic test done. Moreover, thousands more will continue to get Natera testing and be subject to exorbitant bills if Defendant's practices are not stopped. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant (and, to the extent applicable, third party retailers and vendors).

39. Plaintiff's respective claims are typical of the claims of the Class because she had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and was then billed more than $249 for that test.

40. Plaintiff will fairly and adequately represent and protect the interests of the other Class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff has no interests antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel experienced in litigation of this nature.

41. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including, but not limited to:

    a. whether Defendant misrepresents its billing and pricing policy to patients, either directly or through patients' medical providers, through its brochures and other channels of marketing;

      b.      whether Defendant conceals the extremely high price it charges for its genetic panels, thereby deceiving class members into choosing to perform the genetic panels;

      c.      whether Defendant's conduct constituted an unfair, unlawful, and/or fraudulent business practice in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.;

      d.      whether Defendant's conduct violated the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.;

      e.      whether Defendant was unjustly enriched as a result of Defendant's conduct;

      f.      whether Defendant's conduct damaged members of the Class and, if so, the measure of those damages; and

      g.      whether Defendant's practices in connection with billing of its genetic panels should be enjoined.

42. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

43. Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Defendant has acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

44. Class members have suffered and will suffer irreparable harm and damages as a result of Defendant's wrongful conduct.

# CAUSES OF ACTION

## COUNT I

**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**

45. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

46. Plaintiff asserts this cause of action against Defendant for unlawful, unfair and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (the "UCL").

47. Defendant's conduct violates the UCL, as the acts and practices of Defendant constitute a common and continuing course of conduct by means of "unlawful" "unfair" and "fraudulent" business acts or practices within the meaning of the UCL.

48. Defendant's conduct is fraudulent and thus amounts to unfair competition as set forth in the UCL, in that Defendant conceals the price of its genetic tests and misrepresents the price patients would potentially have to pay for its genetic tests. Such misrepresentations and omissions are likely to deceive, and in fact have deceived, thousands of patients.

49. Defendant's conduct is unlawful, and thus amounts to unfair competition as set forth in the UCL, in that it violates, among other things, California Civil Code §§ 1572, 1709 and 1710, as well as California Business & Professions Code § 17500. As described above, Defendant willfully deceived Plaintiff and Class members by misrepresenting the price patients would potentially have to pay for its genetic tests, concealing the amount it charges for its genetic tests, and misrepresenting its billing practice with the intent to induce them to alter their positions to their injury. Defendant's representations were untrue and misleading and Defendant knew, or by exercising reasonable care should have known, such representations were untrue and misleading. Defendant disseminated these untrue and misleading representations as part of a plan or scheme with the intent not to sell its services as so marketed.

50. Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Classes. Therefore, the Defendant acted with conscious disregard for the rights of Plaintiff and members of the Classes.

51. Defendant's conduct is unfair, and thus amounts to unfair competition as set forth in the UCL, in that it is immoral, unethical, oppressive, unscrupulous and substantially injurious to patients who end up with unexpected huge bills that cause severe financial distress.

52. As a direct and proximate cause of Defendant's violations of the UCL, Plaintiffs and the Class suffered an injury in fact and have suffered monetary harm. Defendant, on the other hand, has been unjustly enriched and should be required to make restitution to Plaintiff and the class and/or disgorge its ill-gotten profits pursuant to Business & Professions Code § 17203.

53. Defendant's unlawful, unfair, and fraudulent business practices, as described herein, present a continuing threat to Plaintiff, the Class and the general public in that Defendant continues to misrepresent the price and out-of-pocket expenses that patients would have to bear for its genetic tests. In addition, Defendant has been unjustly enriched as a result of its conduct.

54. A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendant traceable to Plaintiff and members of the Class.

55. Plaintiff and the class seek equitable relief because they have no other adequate remedy at law. Absent equitable relief, Defendant will continue to injure consumers, and harm the public's interest, thus engendering a multiplicity of judicial proceedings.

56. Plaintiff further seeks an order enjoining Defendant from engaging in any unlawful or inequitable acts and practices as alleged herein, because of Defendant's continuing misrepresentations and improper billing practices.

## COUNT II

**Violations of the California Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750, et seq.**

57. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

58. The conduct of Defendant alleged above constitutes an unfair method of competition and unfair or deceptive act or practice in violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA").

59. Defendant is a person as defined by Cal. Civ. Code § 1761(c).

60. Plaintiff and Class members are consumers as defined by Cal. Civ. Code § 1761(d).

61. Defendant's genetic testing services described above constitutes a service as defined by Cal. Civ. Code § 1761(b).

62. Plaintiff's purchase was a transaction under Cal. Civ. Code § 1761(e).

63. The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which, among other instances enumerated in the CLRA, include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)); or "a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law" (§ 1770(a)(14)).

64. Defendant's conduct violates Cal. Civ. Code § 1770(a)(5) in that Defendant misrepresented that its services had the characteristics of price transparency, which in fact they did not have. Defendant violated Cal. Civ. Code § 1770(a)(9) in that it falsely advertised its service to be affordable and price transparent. Further, it falsely advertised that it would offer patients the option of a cash discount of $249 if it found patients owed higher amounts through insurance. In reality, it had no intention of informing patients of the expected charges if put through insurance nor intended to be transparent about the price of its services. Defendant violated Cal. Civ. Code § 1770(a)(14) in that it represented its transactions with patients involved rights and obligations regarding price transparency which, in fact, they did not have or involve.

65. The representations and omissions set forth above are of material facts that a reasonable person would have considered important in deciding whether or not to purchase

Defendant's services. Plaintiff and class members justifiably acted or relied upon Defendant's misrepresentations and omissions to their detriment.

66. Plaintiff and the other members of the Class have been, and continue to be, injured as a direct and proximate result of Defendant's violations of the CLRA.

67. Plaintiff is entitled to pursue a claim against Defendant on behalf of the Class to enjoin Defendant from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1780(a) and § 1781, as well as to pursue costs and attorneys' fees under § 1780(e).

68. Under the requirements of Cal. Civ. Code 1782(a), Plaintiff is serving on Defendant a CLRA notice letter. If Defendant does not rectify these issues within the time period provided by the CLRA, Plaintiff will amend this Complaint to assert claims for additional relief.

## COUNT III

### Breach of Implied Contract or Quasi-Contract

69. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

70. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

71. A contract is implied by law between the Defendant and the Plaintiff and Class members, entitling Plaintiff and Class members an accurate representation of the charges for Defendant's services.

72. A contract is also implied by law between the Defendant and the Plaintiff and Class members, entitling Defendant to fair market or reasonable value of the testing services rendered (the *quantum meruit* of the services performed).

73. Defendant breached the terms of the implied contract by billing Plaintiff and Class members at excessive rates, much higher than reasonable value implied in law, which Plaintiff and Class members were completely unaware of.

74. By means of Defendant's wrongful conduct alleged herein, Defendant knowingly misrepresented the charges for its genetic tests in a manner that was unfair, unconscionable and

oppressive, and knowing the charges would have had an influence in the consumers' decision to purchase the service.

75. As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

76. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of charges upon members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds, under circumstances making it inequitable to do so, constitutes unjust enrichment.

77. Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class. Therefore, the Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

78. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

79. The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Class. Defendant should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched Defendant.

80. A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendant traceable to Plaintiff and members of the Class.

81. Plaintiff further seeks an order enjoining Defendant from engaging in any unlawful or inequitable acts and practices as alleged herein, because of Defendant's continuing misrepresentations and improper billing practices.

82. Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief:

| | | |
|---|---|---|
| | a. | Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff as representative of the Class, and designate the undersigned as Class Counsel; |
| | b. | Declare Defendant's conduct unlawful and enter an order enjoining the Defendant from continuing to engage in the conduct alleged herein; |
| | c. | Award Plaintiff and the Class restitution and/or disgorgement; |
| | d. | Award pre-judgment and post-judgment interest; |
| | e. | Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses; |
| | f. | Grant Plaintiff and the Class payment of reasonable attorneys' fees; and |
| | g. | Grant such other relief as the Court may deem just and proper. |

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all triable issues.

DATED: November 18, 2021                     Respectfully submitted,

**BERMAN TABACCO**

By:  */s / Kristin J. Moody*
       Kristin J. Moody

Joseph J. Tabacco, Jr.
A. Chowning Poppler
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6282
Email: jtabacco@bermantabacco.com
          kmoody@bermantabacco.com
          cpoppler@bermantabacco.com

*Local Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT                                                                 17

Patricia Avery
Philip M. Black
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
Email: pavery@wolfpopper.com
         pblack@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*