Joseph J. Tabacco, Jr. (SBN 75484)
Kristin J. Moody (SBN 206326)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6282
Email: jtabacco@bermantabacco.com
        kmoody@bermantabacco.com

*Local Counsel for Plaintiff and the Proposed Class*

Patricia I. Avery (admitted *Pro Hac Vice*)
Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email: pavery@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH COPLEY, individually and on behalf of all others similarly situated, <br><br>              Plaintiff, <br><br>         v. <br><br> NATERA, INC. <br><br>             Defendant. | Case No.  4:21-cv-08941-YGR <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **1. VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); and** <br><br> **2. VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code 1750, §§ *et seq.*); and** <br><br> **3. BREACH OF IMPLIED CONTRACT OR QUASI-CONTRACT** <br><br> <u>**CLASS ACTION**</u> <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Elizabeth Copley ("Plaintiff" or "Copley"), individually and on behalf of all others similarly situated, brings this action against Natera, Inc. ("Natera" or "Defendant"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

**INTRODUCTION**

1.      Plaintiff brings this class action on behalf of a nationwide class comprised of all persons in the United States who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that test.

2.      Patients across the country are being harassed by Natera's billing practices for its genetic testing services.  Natera, a genetic testing company, offers a range of genetic tests to prospective parents. For example, Natera offers carrier screening tests that screen prospective parents for certain potentially heritable genetic conditions, as well as pre-natal genetic tests that analyze cell-free DNA from a pregnant woman's blood to look for certain chromosomal conditions that could affect the baby's health.  Through brochures and other communications with patients, Natera represents to patients that they will be charged no more than $249 for these tests.

3.      However, despite these representations, thousands of patients have received bills from Natera for several hundred or even thousands of dollars, leaving them shocked, angry, and stressed because they had no idea they were signing up for such an expensive service, which they may not have done had they known the true cost. Natera does not disclose to patients the full charge for tests; instead, Natera misrepresents to patients, through its brochures and other channels of marketing such as physician offices or fertility clinics, that the out-of-pocket expense for the tests would not exceed $249.

4.      Additionally, Natera deceives patients by advertising a Price Transparency Program that it clearly fails to implement. It tells patients that once insurance information is provided, it "generates an insurance estimate"; and "if [it] estimates your cost to exceed [its] cash price, [it will] contact you via text or email and you choose how you pay: insurance or cash." Natera does not do this. Natera simply runs the tests through insurance and bills patients the amount determined by the insurance as patient responsibility. The amounts billed can vary from

$0 to thousands of dollars, leaving patients with absolutely no insight into the amount they could end up being charged.  In other instances, upon information and belief, Natera contacts patients to offer a price of $249 if patients agree to bypass their health insurers and pay Natera directly—thereby admitting that the much higher, undisclosed list prices for the tests are unreasonable, have no relationship with the cost to provide the test, and are not what Natera expects to receive.

5.     By its above conduct of misrepresentations and omissions, Defendant causes a substantial financial burden on new, expecting, and prospective parents, at a time when they are already feeling financially vulnerable. When patients receive enormous bills, often several months after the tests were performed, they are surprised and outraged.  Natera's unresponsive customer service compounds this problem, and many patients give up after trying to call or email Natera a few times, and end up paying the exorbitant bills under financial duress. Patients who are persistent and manage to reach Natera are sometimes offered discounts, whereby Natera offers to waive any charges above $249 if the patient pays within a limited time window—a high-pressure tactic that is designed to fraudulently extract as much money as possible from patients.

6.     As testament to Natera's egregious billing practices, websites such as Yelp, Better Business Bureau, Reddit, and pregnancy forums such as whattoexpect.com are exploding with negative reviews on Natera's billing practices.  For example, as of February 22, 2022, Better Business Bureau has 387 complaints in the last three years, 238 of which are related to "Billings/Collection"; Yelp has 207 reviews, a majority of which are negative reviews that give the company a "1 star" rating. Similarly, a Reddit thread titled "How is this not fraud? – Natera bill" has 107 comments with people narrating their horror experiences with Natera's billing practices, and whattoexpect.com contains several discussion threads titled "Natera is a terrible company"; "Beware Natera Billing!"; "Natera Billing issues" "Natera genetic testing bill $8000?!".

7.     Plaintiff, pregnant with her second child, did Natera's Panorama test after her physician recommended it. She was assured by her physician that the test would not cost more than "a couple hundred dollars." Almost twenty-two months after the date of service, Plaintiff noticed a charge of $14,000 on an Explanation of Benefits statement from her insurer,

Connecticare, for the test. Shocked, her husband made inquiries to Connecticare and also Natera. Natera told Plaintiff and her husband that if they agreed to pay $249 on the call, Natera would write off the rest of the charges. Almost a month later, Plaintiff received a bill from Natera for $721.10 (the amount her insurance ascertained as her responsibility). A few weeks later, she received a second bill from Natera asking her to pay $721.10. After making one payment of $50 to Natera under protest, Plaintiff later received a third bill dated October 24, 2021 for $671.10, due immediately. As is the case for all other members of the proposed class, the bills Plaintiff received from Natera contradicted Natera's promise that its genetic tests would cost patients no more than $249, and were grossly in excess of the reasonable value of the services rendered.

8.      Defendant's conduct with respect to billing for its genetic tests violates the California Unfair Competition Law ("UCL"), the California Consumer Legal Remedies Act ("CLRA"), and common law, which provides that in the absence of an express contract, service providers are entitled to the reasonable value of the services rendered.

## PARTIES

9.      Plaintiff, Elizabeth Copley ("Copley"), is an individual and a resident of Connecticut.

10.      Defendant Natera, Inc. is incorporated in Delaware and has its principal place of business at 201 Industrial Road, Suite 410, San Carlos, California 94070. Defendant is a diagnostic company that provides preconception and prenatal genetic testing services.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C §1332, in that the matter in controversy exceeds the sum or value of $1 million, exclusive of interest and costs; it is a class action of more than 100 potential class members; and more than two-thirds of the class members reside in states other than the state in which Defendant is a citizen.

12.      This Court has personal jurisdiction over Defendant because it is headquartered in California, has its principal place of business in California, and a substantial portion of the acts complained of took place in California. Natera sends out its bills from a California address,

namely "PO Box 299023, San Francisco CA 94139-9023." In the year ended December 31, 2020, it processed most of its tests in its San Carlos, California laboratory (*see* Natera's 2020 Form 10-K, retrieved from investor.natera.com, last accessed February 22, 2022). Natera uses its San Carlos, California address on test brochures, billing correspondence, and test results, and directs patients and providers to call a phone number with a 650- (San Francisco Bay Area) area code with questions. Upon information and belief, Natera's billing policies and practices are established and managed from within this District.

13.     Venue properly lies in this District pursuant to 28 U.S.C. §1391 because Defendant is headquartered in this district, has transacted substantial business within this district within the meaning of 28 U.S.C. §1391, and because a substantial part of the events giving rise to the claims alleged herein occurred in this District.

**INTRADISTRICT ASSIGNMENT**

14.     Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Francisco Division of this District is proper because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in San Mateo County, California, and Defendant's principal place of business is located in San Mateo County, California.

**FACTUAL ALLEGATIONS**

15.     Natera specializes in providing genetic tests for pregnant women and women who wish to become pregnant. It offers several genetic testing panels called Panorama, Horizon, Vistara and Spectrum. The Horizon and Panorama panels contribute a significant portion of the company's revenues. Upon information and belief, the cost to perform these tests is significantly less than $249 per test.

16.     Natera operates laboratories in Austin, Texas and San Carlos, California, both of which perform the Panorama and Horizon tests. Specimens from New York are tested only at the California laboratory since it is the only Natera laboratory approved by the New York State Department of Health. Natera's 2020 10-K dated February 25, 2021, reported that, in 2020, it had processed the greatest number of tests in its CLIA-certified laboratory in California.

**<u>Natera's Deceptive Billing Practices</u>**

17.     Natera's billing policy and practices are deceptive, unfair, and misleading. Natera conceals that its list price for genetic testing services is thousands of dollars, depriving patients of making an informed decision about whether to undergo those tests. Instead, Natera promises patients, both directly and through marketing channels with medical providers, that the cost to patients will not exceed $249.

18.     By employing a marketing and billing policy that is erratic and designed to deceive, Natera misleads thousands of pregnant or trying-to-conceive patients by failing to accurately disseminate crucial price information to patients and making false and/or misleading statements in marketing materials.

19.     First, Natera fails to ensure that every patient is made aware of its billing practices. As a common theme, Natera fails to forewarn patients of the extremely high price it charges for its genetic tests and the fact that many insurance plans do not cover these tests, or do not cover portions of them. For example, Natera fails to inform patients that while some insurance companies may cover the Panorama test, they may consider the "microdeletions" add-on to that test as experimental, and deny coverage for that portion of the test (which, upon information and belief, Natera charges for separately). Since genetic testing still remains a fairly new area of medical science and may not be fully covered by some insurance plans, disclosure of the full charge for the tests is especially crucial for patient decision making.

20.     Second, even in cases where Natera provides patients with its billing policy, Natera nevertheless still conceals the full price for the genetic tests. For example, Natera does not tell patients that the list price for a Panorama test is an astounding $8,000. Where patients have not met their deductible or where their insurance denies coverage, the full $8,000 list price or the amount above what the insurance "allows" (which is often more than $500) becomes the patient's responsibility. Natera does not disclose to patients that Natera will bill them for the amount that their insurance deems the patient responsibility, whether or not it exceeds $249.

21.     Natera's website, brochure and other marketing materials that purport to provide billing and pricing information are misleading and conceal crucial information, the disclosure of which could potentially affect a patient's decision to undergo these tests.

22.     On the "Pricing and Billing Information" page under the Women's Health category on Natera's website, www.natera.com/womens-health/pricing-billing/, Natera boasts of offering "access programs and price transparency – rooted in [their] commitment to provide affordable testing for all who can benefit." Quite contrary to this "commitment," Natera's pricing page fails to transparently disclose any prices for its genetic tests. Instead, Natera makes false claims of providing "clear cost estimates for patients." Natera describes its "Price Transparency Program," to include four steps, namely: (1) "Medical provider orders a test. We start processing the patient sample." (2) "Natera billing issues an insurance estimate." (3) "If we estimate your cost to exceed our cash price, we'll contact you via text or email and you choose how you pay: insurance or cash." (4) "If you choose insurance, Natera billing issues an invoice to you once Natera reviews your health plan's confirmation of exactly how much you owe." This information is displayed in a graphic:



Medical provider orders a test. We start processing the patient sample.



Natera billing issues an insurance estimate.



If we estimate your cost to exceed our cash price, we'll contact you via text or email and you choose how you pay: insurance or cash.

If you choose insurance, Natera billing issues an invoice to you once Natera reviews your health plan's confirmation of exactly how much you owe.

Source: https://www.natera.com/womens-health/pricing-billing/ (last accessed February 22, 2022).

23.     Unfortunately, in practice, Natera does not follow these steps, particularly steps 2 and 3. In practice, Natera neither runs insurance estimates for patients prior to billing nor contacts patients to give them an option to pay through insurance or cash, but rather surprises patients with huge bills, causing them shock and distress. Upon information and belief, when Natera does contact patients, it is simply to ask whether they wish to pay cash or submit the bill to insurance. Natera does not explain that the out-of-pocket cost may exceed $249 if patients choose to utilize their insurance coverage, even if the patient's insurance has already paid that amount (or more) to Natera.

24.     Further, Natera's Panorama / Horizon Patient Brochure, available at www.natera.com/resource-library/, misleadingly responds to the question "How much are

Horizon and Panorama? Are they covered by insurance?" by, *inter alia*, stating: "Based on previously approved claims data, the majority of patients have an out-of- pocket expense between $100 and $200 for each test, once their deductible has been met.* *Based on previously approved claims from 2016 to 2017. Some patients will owe more, many will owe less." *See* https://www.natera.com/wp-content/uploads/2021/02/Panorama-Horizon-Patient-Brochure.pdf (last accessed February 22, 2022). This statement gives patients a false sense of comfort that their out of pocket expenses will not exceed $200.

25.     Another Natera brochure pertaining to the genetic panels titled "Natera Billing Policy" provides, *inter alia*, that Natera is "in network with most insurance plans including: 1. HMO & PPO 2. Medicaid 3. Tricare 4. HAS's and FSA's and 5. Compassionate Care Program available for unemployed and low income"; and "the average out-of-pocket cost is between $100-249." There is no mention of the full price that Natera may charge for its tests, and patients are left expecting to pay not more than $249.

26.     Upon information and belief, Natera induces medical providers to provide misleading billing information to patients by failing to disclose its billing practices to providers, and instead informing them that the cost of its tests to patients would not exceed $249. Upon information and belief, as a result of Natera's marketing to providers, providers themselves are given the impression that patients will not owe more than $100-$200 for Natera tests, and convey this information to patients. Upon information and belief, Natera is aware that this misinformation about the cost of its tests is routinely communicated from providers to patients, and encourages these communications. Natera's bills to patients reflect Natera's awareness that patients may be hearing about Natera for the first time when they receive a bill from Natera. To wit, there is a section on the back of Natera's bills that reads: "Who is Natera? Natera offers non-invasive genetic testing services. Your physician is uncompromising in patient care and asked us to perform important tests on a blood sample collected during your office visit." It further reads: "Why did I receive a Natera Statement? You are receiving a statement/bill from Natera because genetic testing services were performed, on your behalf, at the request of your physician."

27.     In addition, Natera will also bill in-network patients exorbitant and improper charges. In these bills, Natera misleadingly claims that the patient's insurance did not cover the test, when in reality, it is Natera that failed to obtain required pre-authorization from the insurer(s). Consequently, patients who should owe nothing for the test, or only a co-pay, are hit with a surprise bill stating that they owe much more than what they expected.

28.     Natera is aware of its obligation to obtain pre-authorization, but intentionally or recklessly does not obtain that pre-authorization. Natera's practice of billing in-network patients is an attempt to circumvent its pre-authorization obligations with insurers by improperly and fraudulently obtaining payment directly from patients.

**Experiences with Natera's Billing Policy**

Plaintiff Elizabeth Copley

29.     In late 2019, when Copley was pregnant with her second child, Copley's physician advised her to do the Natera Panorama Non-Invasive Prenatal Testing panel ("Panorama panel") due to her age. Upon specifically inquiring how much the test would cost, Copley was assured that it would not be more than "a couple hundred dollars." On that assurance, she agreed to get her blood drawn for the "Panorama Prenatal Screen with Microdeletions" panel (procedure codes: Fetal Chromosomal Aneuploidy with Microdeletions 81420HA, 81422HA) on October 22, 2019. There was no discussion between her and her doctor about whether she wanted to run the test through insurance or self-pay; her doctor's clinic had her insurance details and, just like her other bloodwork, the Natera test was also run through her insurance.

30.     Copley did not hear anything further about or from Natera until she noticed a charge of $8,000 on her Explanation of Benefits ("EOB") statement from her insurer, Connecticare. The EOB was for the plan year 01/01/2019 to 12/31/2019. Natera had billed Connecticare $3,900 for Pathology services and $4,100 for Laboratory services in connection with the Panorama panel. Connecticare denied the claim entirely, transferring potentially the entire charge onto Plaintiff. Copley was shocked to see these exorbitant charges and by the fact that the entire charge could potentially become her responsibility. Her husband, Charles Copley, called Connecticare inquiring about the charge. Connecticare advised him to call Natera.

31.     Charles Copley then called Natera inquiring about the charge. He informed them that he and his wife were completely unaware that they could be charged thousands of dollars for the Panorama panel, a situation vastly different from what Copley's doctor had earlier represented to Copley about the cost of the test. The Natera representative responded saying that if they agreed to pay off the bill instantly, Natera would accept a payment of $249 and waive the rest of the charges. With no other option in sight, Charles Copley agreed to pay $249 on the phone using his credit card and requested the representative for a receipt of payment.

32.     However, Copley nevertheless received a bill dated July 9, 2021 for $721.10 from Natera for the very same test. The bill was due on August 8, 2021.  Copley then received a second bill dated August 16, 2021 for $721.10, due upon receipt. Copley made one payment of $50 to Natera by check, noting on the check that it was paid under protest. Copley later received a third bill dated October 24, 2021 for $671.10, due immediately.

Other experiences

33.     Just like Plaintiff, there have been hundreds, if not thousands, of women who have had similar horrific experiences with Natera. Yelp, BBB, Reddit, and pregnancy forums such as whattoexpect.com are filled with negative experiences by patients who have been traumatized by Defendant's deceptive and fraudulent billing practices, which include: concealing the price of a Natera genetic test; surprise balance billing patients after recovering a portion from third-party payors (i.e. insurance companies); misleading patients about their out-of-pocket costs for a Natera genetic test; making false statements regarding Natera's Price Transparency Program; and harassing patients by repeatedly sending bills even after they have paid Natera's "prompt pay" discount in exchange for the rest of charges being waived.

34.     Online reviews on Yelp (yelp.com/biz/natera-san-carlos, last accessed February 8, 2022) confirm that Natera's billing practices are consistent, longstanding, and affecting patients throughout the country. One reviewer, in a review dated June 26, 2020, wrote: "Terrible company who preys on vulnerable families. We received a bill for $1,590 despite our OBGYN saying the cost is $249 if insurance does not cover it. When we called customer support they confirmed that the rate was $249 but because we didn't respond within 30 days the pricing went up to $1,590.

How is that even possible? Stay as far away as you can." Another reviewer, in a review dated July 7, 2021, wrote: "[W]hat Natera is doing takes the cake. They advertise this 'Price Transparency Program' and tell ordering providers that at most the test will cost us $249 if insurance doesn't pay. What they advertise is, someone checks the coverage/benefits, makes an estimate, and contacts the patient if it might be in their interest to pay self-pay at $249. What they ACTUALLY do is, per the authorization to file insurance you sign on the order, file your insurance and if your insurance pays they take that money and if your insurance leaves you more than $249 out-of-pocket you get a one-time offer for a prompt pay discount of $249, then they go back to trying to bill you the massive coinsurance. In our case insurance paid them over $2k and left us about $1800. They used that $1800 and the fact that my wife authorized insurance to be filed (in the event that it would be better for us than $249) to extort us for the additional $249." Recently, in a review dated January 13, 2022, a reviewer remarked: "Super funny how on the forms you fill out before sending in the sample says 'if your insurance doesn't cover the cost, your maximum payment will be $249', the. [sic] You get a bill in the mail that says you owe over $2700, but your insurance paid over $600 already. When I called and asked what happened the lady on the line goes, we can offer you the $249 deal, but you have to pay with a credit card now.[]  Not sure why I still have to pay $249 when they already stole over $600 from BCBS. Very strange, I'd like some answers from them, but no one speaks English on the hotline."

        35.     On Natera's Better Business Bureau Profile, patients' reported experiences are no different, with one reviewer writing: "We were told by our fertility clinic for genetic testing out of pocket cost would be $200 each test which we had 2 done mine and my spouse. We were given a paper with this information and told the genetic testing company would contact us once talking to our insurance and [if] it was more than $200 we could do the self-pay option. Nobody ever contacted us and they billed each of our insurance over $14,000 and now insurance is stating we owe an upward of $7000. Nobody ever contacted us to tell us this and offer us the self-pay option……" https://www.bbb.org/us/ca/san-carlos/profile/laboratory-research/natera-1116-537368/complaints (last accessed Oct. 27, 2021).

1

**CLASS ACTION ALLEGATIONS**

2      36.      Plaintiff brings this suit as a class action on behalf of herself and all others

3  similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and/or 23(b)(3).

4      37.      Plaintiff seeks to represent a nationwide class comprising of all persons in the

5  United States who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by

6  Natera, and were then billed more than $249 for that test (the "Class").

7      38.      Upon completion of discovery with respect to scope of the Class, Plaintiff reserves

8  the right to amend the Class definitions. Excluded from the Class are Defendant, its parents,

9  subsidiaries and affiliates, directors and officers, and members of their immediate families.

10      39.      The members of the Class are so numerous that the joinder is impracticable. It is

11  believed that at a minimum, thousands of persons across the United States have received bills in

12  excess of $249 from Natera for these genetic tests, and thousands more will continue to be

13  subjected to these exorbitant bills if Defendant's practices are not stopped. The precise number of

14  Class members and their identities are unknown to Plaintiff at this time but may be determined

15  through discovery. Class members may be notified of the pendency of this action by mail, email,

16  and/or publication through the distribution records of Defendant (and, to the extent applicable,

17  third party retailers and vendors).

18      40.      Plaintiff's respective claims are typical of the claims of the Class because she had

19  a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and was then billed

20  more than $249 for that test.

21      41.      Plaintiff will fairly and adequately represent and protect the interests of the other

22  Class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff has no interests

23  antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution

24  of this action and has retained counsel experienced in litigation of this nature.

25      42.      Common questions of law and fact exist as to all members of the Class and

26  predominate over any questions affecting only individual members of the Class, including, but

27  not limited to:

28

a.      whether Defendant misrepresents its billing and pricing policy to patients, either directly or through patients' medical providers, through its brochures and other channels of marketing;

b.      whether Defendant conceals the extremely high price it charges for its genetic panels, thereby deceiving class members into choosing to perform the genetic panels;

c.      whether Defendant's conduct constituted an unfair, unlawful, and/or fraudulent business practice in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.;

d.      whether Defendant's conduct violated the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.;

e.      whether Defendant was unjustly enriched as a result of Defendant's conduct;

f.      whether Defendant's conduct damaged members of the Class and, if so, the measure of those damages; and

g.      whether Defendant's practices in connection with billing of its genetic panels should be enjoined.

43.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

44.     Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Defendant has acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

45.     Class members have suffered and will suffer irreparable harm and damages as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT I

**Violations of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, et seq.**

46.     Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

47.     Plaintiff asserts this cause of action against Defendant for unlawful, unfair and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (the "UCL").

48.     Defendant's conduct violates the UCL, as the acts and practices of Defendant constitute a common and continuing course of conduct by means of "unlawful" "unfair" and "fraudulent" business acts or practices within the meaning of the UCL.

49.     Defendant's conduct is fraudulent and thus amounts to unfair competition as set forth in the UCL, in that Defendant conceals the price of its genetic tests and misrepresents the price patients would potentially have to pay for its genetic tests. Such misrepresentations and omissions are likely to deceive, and in fact have deceived, thousands of patients.

50.     Defendant's conduct is unlawful, and thus amounts to unfair competition as set forth in the UCL, in that it violates, among other things, California Civil Code §§ 1572, 1709 and 1710, as well as California Business & Professions Code § 17500. As described above, Defendant willfully deceived Plaintiff and Class members by misrepresenting the price patients would potentially have to pay for its genetic tests, concealing the amount it charges for its genetic tests, and misrepresenting its billing practice with the intent to induce them to alter their positions to their injury. Defendant's representations were untrue and misleading and Defendant knew, or by exercising reasonable care should have known, such representations were untrue and misleading. Defendant disseminated these untrue and misleading representations as part of a plan or scheme with the intent not to sell its services as so marketed.

51.     Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Classes. Therefore, the Defendant acted with conscious disregard for the rights of Plaintiff and members of the Classes.

52.     Defendant's conduct is unfair, and thus amounts to unfair competition as set forth in the UCL, in that it is immoral, unethical, oppressive, unscrupulous and substantially injurious to patients who end up with unexpected huge bills that cause severe financial distress.

53.     As a direct and proximate cause of Defendant's violations of the UCL, Plaintiffs and the Class suffered an injury in fact and have suffered monetary harm. Defendant, on the other hand, has been unjustly enriched and should be required to make restitution to Plaintiff and the class and/or disgorge its ill-gotten profits pursuant to Business & Professions Code § 17203.

54.     Defendant's unlawful, unfair, and fraudulent business practices, as described herein, present a continuing threat to Plaintiff, the Class and the general public in that Defendant continues to misrepresent the price and out-of-pocket expenses that patients would have to bear for its genetic tests. In addition, Defendant has been unjustly enriched as a result of its conduct.

55.     A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendant traceable to Plaintiff and members of the Class.

56.     Plaintiff and the class seek equitable relief because they have no other adequate remedy at law. Absent equitable relief, Defendant will continue to injure consumers, and harm the public's interest, thus engendering a multiplicity of judicial proceedings.

57.     Plaintiff further seeks an order enjoining Defendant from engaging in any unlawful or inequitable acts and practices as alleged herein, because of Defendant's continuing misrepresentations and improper billing practices.

## COUNT II

### Violations of the California Consumer Legal Remedies Act

### Cal. Civ. Code §§ 1750, et seq.

58.     Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

59.     The conduct of Defendant alleged above constitutes an unfair method of competition and unfair or deceptive act or practice in violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA").

60.     Defendant is a person as defined by Cal. Civ. Code § 1761(c).

61.     Plaintiff and Class members are consumers as defined by Cal. Civ. Code § 1761(d).

62.     Defendant's genetic testing services described above constitutes a service as defined by Cal. Civ. Code § 1761(b).

63.     Plaintiff's purchase was a transaction under Cal. Civ. Code § 1761(e).

64.     The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which, among other instances enumerated in the CLRA, include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)); or "a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law" (§ 1770(a)(14)).

65.     Defendant's conduct violates Cal. Civ. Code § 1770(a)(5) in that Defendant misrepresented that its services had the characteristics of price transparency, which in fact they did not have. Defendant violated Cal. Civ. Code § 1770(a)(9) in that it falsely advertised its service to be affordable and price transparent. Further, it falsely advertised that it would offer patients the option of a cash discount if it found patients owed higher amounts through insurance. In reality, it had no intention of informing patients of the expected charges if put through insurance nor intended to be transparent about the price of its services.  Defendant violated Cal. Civ. Code § 1770(a)(14) in that it represented its transactions with patients involved rights and obligations regarding price transparency which, in fact, they did not have or involve.

66.     The representations and omissions set forth above are of material facts that a reasonable person would have considered important in deciding whether or not to purchase

1    Defendant's services. Plaintiff and class members justifiably acted or relied upon Defendant's

2    misrepresentations and omissions to their detriment.

3        67.    Plaintiff and the other members of the Class have been, and continue to be, injured

4    as a direct and proximate result of Defendant's violations of the CLRA.

5        68.    Plaintiff is entitled to pursue a claim against Defendant on behalf of the Class to

6    enjoin Defendant from continuing its unfair or deceptive acts or practices under Cal. Civ. Code

7    § 1780(a) and § 1781, as well as to pursue costs and attorneys' fees under § 1780(e).

8        69.    On November 19, 2021, Plaintiff served Defendant with written notice of its

9    CLRA violations pursuant to Cal. Civ. Code § 1782, via letter sent by certified mail, return

10   receipt requested. After the requisite thirty days, Defendant failed to respond to the CLRA notice

11   letter, and did not make any appropriate correction, repair, replacement, or other remedy.

12   Pursuant to Cal. Civ. Code § 1782, Plaintiff is thus entitled to seek damages at this time.

13   Accordingly, Plaintiff seeks damages on behalf of herself and the Class as permitted by Cal. Civ.

14   Code § 1782.

15                                    **<u>COUNT III</u>**

16                        **Breach of Implied Contract or Quasi-Contract**

17       70.    Plaintiff hereby incorporates by reference all allegations made in the previous

18   paragraphs.

19       71.    Plaintiff brings this claim individually and on behalf of the members of the Class

20   against Defendant.

21       72.    A contract is implied by law between the Defendant and the Plaintiff and Class

22   members, entitling Plaintiff and Class members an accurate representation of the charges for

23   Defendant's services.

24       73.    A contract is also implied by law between the Defendant and the Plaintiff and

25   Class members, entitling Defendant to fair market or reasonable value of the testing services

26   rendered (the quantum meruit of the services performed).

27

28

74.     Defendant breached the terms of the implied contract by billing Plaintiff and Class members at excessive rates, much higher than reasonable value implied in law, which Plaintiff and Class members were completely unaware of.

75.     By means of Defendant's wrongful conduct alleged herein, Defendant knowingly misrepresented the charges for its genetic tests in a manner that was unfair, unconscionable and oppressive, and knowing the charges would have had an influence in the consumers' decision to purchase the service.

76.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

77.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of charges upon members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds, under circumstances making it inequitable to do so, constitutes unjust enrichment.

78.     Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class. Therefore, the Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

79.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

80.     The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Class. Defendant should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched Defendant.

81.     A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendant traceable to Plaintiff and members of the Class.

82.     Plaintiff further seeks an order enjoining Defendant from engaging in any unlawful or inequitable acts and practices as alleged herein, because of Defendant's continuing misrepresentations and improper billing practices.

83.     Plaintiff and members of the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief:

a.     Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff as representative of the Class, and designate the undersigned as Class Counsel;

b.     Declare Defendant's conduct unlawful and enter an order enjoining the Defendant from continuing to engage in the conduct alleged herein;

c.     Award Plaintiff and the Class damages;

d.     Award Plaintiff and the Class restitution and/or disgorgement;

e.     Award pre-judgment and post-judgment interest;

f.     Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

g.     Grant Plaintiff and the Class payment of reasonable attorneys' fees; and

h.     Grant such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and the Class members demand a trial by jury on all triable issues.

DATED: February 22, 2022                    Respectfully submitted,

Joseph J. Tabacco, Jr.
Kristin J. Moody
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6282
Email: jtabacco@bermantabacco.com
          kmoody@bermantabacco.com

*Attorneys for Plaintiff and the Proposed Class*

1

**WOLF POPPER LLP**

2

By: ___/s/ Patricia Avery_____
           Patricia Avery (admitted *Pro Hac Vice*)

3

Philip M. Black (SBN 308619)

4

845 Third Avenue
New York, NY 10022

5

Telephone: (212) 759-4600
Facsimile: (212) 486-2093

6

Email: pavery@wolfpopper.com

7

*Attorneys for Plaintiff and the Proposed Class*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28