Joseph J. Tabacco, Jr. (SBN 75484)
Kristin J. Moody (SBN 206326)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermantabacco.com
  kmoody@bermantabacco.com
  avahdat@bermantabacco.com

*Local Counsel for Plaintiff and the Proposed Class*

Patricia I. Avery (admitted *Pro Hac Vice*)
Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone:  (212) 759-4600
Email: pavery@wolfpopper.com
  pblack@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH COPLEY, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>   v.<br><br>NATERA, INC.<br><br>     Defendant. | Case No.  4:21-cv-08941-YGR<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**1. VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); and**<br><br>**2. VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code 1750, §§ *et seq.*); and**<br><br>**3. BREACH OF IMPLIED CONTRACT OR QUASI-CONTRACT**<br><br><u>**CLASS ACTION**</u><br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Elizabeth Copley ("Plaintiff" or "Copley"), individually and on behalf of all others similarly situated, brings this action against Natera, Inc. ("Natera" or "Defendant"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

**INTRODUCTION**

1.     Plaintiff brings this class action on behalf of a nationwide class comprised of all persons in the United States who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that test.

2.     Patients across the country are being harassed by Natera's billing practices for its genetic testing services.  Natera, a genetic testing company, offers a range of genetic tests to prospective parents. For example, Natera offers carrier screening tests that screen prospective parents for certain potentially heritable genetic conditions, as well as prenatal genetic tests that analyze cell-free DNA from a pregnant woman's blood to look for certain chromosomal conditions that could affect the baby's health.  Through brochures and other communications with patients, usually via patients' medical providers, Natera represents to patients that they will be charged no more than $249 for these tests.

3.     However, despite these representations, thousands of patients have received bills from Natera for several hundred or even thousands of dollars, leaving them shocked, angry, and stressed because they had no idea they were signing up for such an expensive service, which they may not have done had they known the true cost. Natera does not disclose to patients the full charge for tests; instead, Natera misrepresents to patients, through its brochures and other marketing channels such as physician offices or fertility clinics, that the out-of-pocket expense for the tests would not exceed $249.

4.     Additionally, Natera deceives patients by advertising a Price Transparency Program that it clearly fails to implement. It tells patients that once insurance information is provided, it "generates an insurance estimate"; and "if [it] estimates your cost to exceed [its] cash price, [it will] contact you via text or email and you choose how you pay: insurance or cash." Natera does not do this. Natera simply runs the tests through insurance and bills patients the

1    amount determined by the insurance as patient responsibility. The amounts billed can vary from

2    $0 to thousands of dollars, leaving patients with absolutely no insight into the amount they could

3    end up being charged.  In other instances, Natera offers a price of $249 if patients agree to bypass

4    their health insurers and pay Natera directly—thereby admitting that the much higher,

5    undisclosed list prices for the tests are unreasonable, have no relationship with the cost to provide

6    the test, and are not what Natera expects to receive.

7        5.    By its above conduct of misrepresentations and omissions, Defendant causes a

8    substantial financial burden on new, expecting, and prospective parents, at a time when they are

9    already feeling financially vulnerable. When patients receive enormous bills, often several

10   months after the tests were performed, they are surprised and outraged.  Natera's unresponsive

11   customer service compounds this problem, and many patients give up after trying to call or email

12   Natera a few times, and end up paying the exorbitant bills under financial duress. Patients who

13   are persistent and manage to reach Natera are sometimes offered discounts, whereby Natera

14   offers to waive any charges above $249 if the patient pays within a limited time window—a high-

15   pressure tactic that is designed to fraudulently extract as much money as possible from patients.

16       6.    As testament to Natera's egregious billing practices, websites such as Yelp, Better

17   Business Bureau, Reddit, and What to Expect are exploding with negative reviews on Natera's

18   billing practices.  For example, as of September 14, 2022, Better Business Bureau has 442

19   complaints in the last three years, 107 of which are related to "Billings/Collection"; Yelp has 211

20   reviews, a majority of which are negative reviews that give the company a "1 star" rating.

21   Similarly, a Reddit thread titled "How is this not fraud? – Natera bill" has 106 comments with

22   people narrating their horror experiences with Natera's billing practices.  Over the years, the site

23   whattoexpect.com has also contained several discussion threads titled, e.g., "Natera is a terrible

24   company"; "Beware Natera Billing!"; "Natera Billing issues"; "Natera genetic testing bill

25   $8000?!".

26       7.    Plaintiff, pregnant with her second child, did Natera's Panorama test after her

27   OB/GYN's office recommended it. She was assured by her OB/GYN's office that the test would

28   not cost more than, at most, $250. However, thereafter, Plaintiff noticed charges totaling $8000

on an Explanation of Benefits statement from her insurer, Connecticare, for the test. Shocked, her husband called Natera, which told him that Copley would be charged $249 for the test. This $249 price directly from the Natera representative confirmed the pricing that Plaintiff had been told by her OB/GYN's office.  Over a year and a half later, however, Plaintiff received a bill from Natera for $721.10, and then received a second and a third bill from Natera for the same amount. After making one payment of $50 to Natera under protest, Plaintiff later received a "final notice" bill dated October 24, 2021 for $671.10, due immediately. As is the case for all other members of the proposed class, the bills Plaintiff received from Natera contradicted Natera's promise that its genetic tests would cost patients no more than $249, and were grossly in excess of the reasonable value of the services rendered.

8.      The statement that Natera's test would cost Plaintiff not more than $250 originated with Natera in California.  Natera's business model relies on having physicians' offices recommend Natera testing to patients, and then billing patients separately for the tests, without communicating to patients the true amount that Natera will charge for the tests.  Natera decides what it will represent as the charge for its tests, and then communicates that information to patients, as well as to physicians' offices with the knowledge and intent that the information will then be transmitted to patients.  As described in more detail below:

*      Natera's bills have a section entitled "Who Is Natera?," showing that Natera knows that patients often hear about the company and its tests, including the price thereof, from their physicians, and not from Natera directly.

*      Both Plaintiff's former and current OB/GYNs had relationships with Natera through Natera sales representatives, who told both of these OB/GYN's offices that Natera tests would not cost their patients more than, at most, $250.

*      When Plaintiff's husband called Natera, the Natera representative confirmed on the phone that Plaintiff would be charged $249 for the test (even though Natera then billed Plaintiff for more than twice this amount).

9.      Defendant's conduct with respect to billing for its genetic tests violates the California Unfair Competition Law ("UCL"), the California Consumer Legal Remedies Act

("CLRA"), and common law, which provides that in the absence of an express contract, service providers are entitled to the reasonable value of the services rendered.

## PARTIES

10.     Plaintiff, Elizabeth Copley ("Copley"), is a natural person.  She is a citizen of the United States and of the State of Connecticut, where she is domiciled.  Plaintiff resides in, and intends to remain in, the State of Connecticut.

11.     Defendant Natera, Inc. is incorporated in Delaware and has its principal place of business at 201 Industrial Road, Suite 410, San Carlos, California 94070. Defendant is a diagnostic company that provides preconception and prenatal genetic testing services.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C §1332, in that the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs; it is a class action of more than 100 potential class members; and more than two-thirds of the class members reside in states other than the state in which Defendant is a citizen.

13.     This Court has personal jurisdiction over Defendant because it is headquartered in California, has its principal place of business in California, and a substantial portion of the acts complained of took place in California.

14.     Venue properly lies in this District pursuant to 28 U.S.C. §1391 because Defendant is headquartered in this district, has transacted substantial business within this district within the meaning of 28 U.S.C. §1391, and because a substantial part of the events giving rise to the claims alleged herein occurred in this District.

## INTRADISTRICT ASSIGNMENT

15.     Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Francisco Division of this District is proper because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in San Mateo County, California, and Defendant's principal place of business is located in San Mateo County, California.

# FACTUAL ALLEGATIONS

16.     Natera specializes in providing genetic tests for pregnant women and women who wish to become pregnant. It offers several genetic testing panels called Panorama, Horizon, Vistara, and Spectrum. The Horizon and Panorama panels contribute a significant portion of the company's revenues. The cost to perform these tests is significantly less than $249 per test.

17.     Natera operates laboratories in Austin, Texas and San Carlos, California, both of which process the Panorama and Horizon tests. Specimens from New York are tested only at the California laboratory since it is the only Natera laboratory approved by the New York State Department of Health.

18.     In the year ended December 31, 2020, Natera processed most of its tests in its San Carlos, California laboratory (*see* Natera's 2020 Form 10-K, retrieved from investor.natera.com, accessed February 22, 2022).

19.     Natera's bills are sent from, and are payable to, a San Francisco, California address, namely "PO Box 399023, San Francisco CA 94139-9023."

20.     Natera uses its San Carlos, California address on test brochures, including brochures for its most popular tests, Panorama and Horizon.

21.     Natera uses its San Carlos, California address on test results.

22.     Natera directs patients and providers who have questions to call a phone number with a 650- (San Francisco Bay Area) area code to obtain answers, including within a Natera Billing Guide brochure.

23.     Natera's billing policies and practices are established and managed from within this District.

## Natera's Deceptive Billing Practices

24.     Natera's billing policy and practices are deceptive, unfair, and misleading. Natera conceals that its list price for genetic testing services is thousands of dollars, depriving patients of making an informed decision about whether to undergo those tests. Instead, Natera promises patients, both directly and through marketing channels with medical providers, that the cost to patients will not exceed $249.

25. Natera's deceptive billing policy misleads thousands of pregnant or trying-to-conceive patients by failing to accurately disseminate crucial price information to patients and making false and/or misleading statements in marketing materials.

26. First, Natera fails to ensure that every patient is made aware of its billing practices. As a common theme, Natera fails to forewarn patients of the extremely high price it charges for its genetic tests and the fact that many insurance plans do not cover these tests, or do not cover portions of them. For example, Natera fails to inform patients that while some insurance companies may cover the Panorama test, they may consider the "microdeletions" add-on to that test as experimental, and deny coverage for that portion of the test (which Natera charges for separately). Since genetic testing remains a fairly new area of medical science and may not be fully covered by some insurance plans, disclosure of the full charge for the tests is especially crucial for patient decision making.

27. Second, even in cases where Natera provides patients with its billing policy, Natera nevertheless still conceals the full price for the genetic tests. For example, Natera does not tell patients that the list price for a Panorama test is an astounding $8,000. Where patients have not met their deductible or where their insurance denies coverage, the full $8,000 list price or the amount above what the insurance "allows" (which is often more than $500) becomes the patient's responsibility. Natera does not disclose to patients that Natera will bill them for the amount that their insurance deems the patient responsibility, whether or not it exceeds $249.

28. Natera's website, brochures, and other marketing materials that purport to provide billing and pricing information are misleading and conceal crucial information, the disclosure of which could potentially affect a patient's decision to undergo these tests.

29. On the "Pricing and Billing Information" page under the Women's Health category on Natera's website, www.natera.com/womens-health/pricing-billing/, Natera boasts of offering "access programs and price transparency – rooted in [their] commitment to provide affordable testing for all who can benefit." Quite contrary to this "commitment," Natera's pricing page fails to transparently disclose any prices for its genetic tests. Instead, Natera makes false claims of providing "clear cost estimates for patients." Natera has described its "Price

Transparency Program," to include four steps, namely: (1) "Medical provider orders a test. We start processing the patient sample." (2) "Natera billing issues an insurance estimate." (3) "If we estimate your cost to exceed our cash price, we'll contact you via text or email and you choose how you pay: insurance or cash." (4) "If you choose insurance, Natera billing issues an invoice to you once Natera reviews your health plan's confirmation of exactly how much you owe." This information is displayed in a graphic:



Medical provider orders a test. We start processing the patient sample.



Natera billing issues an insurance estimate.



If we estimate your cost to exceed our cash price, we'll contact you via text or email and you choose how you pay: insurance or cash.



If you choose insurance, Natera billing issues an invoice to you once Natera reviews your health plan's confirmation of exactly how much you owe.

Source: https://www.natera.com/womens-health/pricing-billing/ (accessed February 22, 2022).

30.     Unfortunately, in practice, Natera does not follow these steps, particularly steps 2 and 3. In practice, Natera neither runs insurance estimates for patients prior to billing nor contacts patients to give them an option to pay through insurance or cash, but rather surprises patients with huge bills, causing them shock and distress. When Natera does contact patients, it is simply to ask

whether they wish to pay cash or submit the bill to insurance. Natera does not explain that the out-of-pocket cost may exceed $249 if patients choose to utilize their insurance coverage, even if the patient's insurance has already paid that amount (or more) to Natera.

31.     Further, a version of Natera's Panorama / Horizon Patient Brochure misleadingly responds to the question "How much are Horizon and Panorama? Are they covered by insurance?" by, *inter alia*, stating: "Based on previously approved claims data, the majority of patients have an out-of- pocket expense between $100 and $200 for each test, once their deductible has been met.*" *See* https://www.natera.com/wp-content/uploads/2021/02/Panorama-Horizon-Patient-Brochure.pdf (accessed on February 22, 2022 and September 14, 2022).  At the bottom of the page, in significantly smaller font, text following an asterisk reads: "*Based on previously approved claims from 2016 to 2017. Some patients will owe more, many will owe less." *Id.*  This brochure gives Natera's address in San Carlos, California.

32.     Another Natera brochure pertaining specifically to the Horizon test makes substantially this same representation, stating: "Based on previously approved claims data, the majority of patients have an out-of-pocket expense between $100 and $200, once their deductible has been met.*"  This is followed by substantially the same footnote, stating: "*Based on previously approved claims in 2019.  Some patients will owe more; many will owe less."   This brochure also gives Natera's address in San Carlos, California.

33.     These statements in the Panorama/Horizon brochures give patients a false sense of comfort that their out-of-pocket expenses will not exceed roughly a couple of hundred dollars.

34.     A "Natera Billing Guide" brochure similarly states: "If you've met your deductible, the average out-of-pocket expense is less than $249 . . . . If your insurance plan denies the claim, you will be eligible for our discounted cash price."  This brochure gives Natera's address in San Carlos, California.

35.     Another Natera brochure pertaining to the genetic panels titled "Natera Billing Policy" provides, *inter alia*, that Natera is "in network with most insurance plans including: 1. HMO & PPO 2. Medicaid 3. Tricare 4. HAS's and FSA's and 5. Compassionate Care Program available for unemployed and low income"; and "the average out-of-pocket cost is between $100-

249." There is no mention of the full price that Natera may charge for its tests, and patients are left expecting to pay not more than $249.

36.     Natera induces medical providers to provide misleading billing information to patients by failing to disclose its billing practices to providers, and instead informing them that the cost of its tests to patients will not exceed $249. As a result of Natera's marketing to providers, providers themselves are given the impression that patients will not owe more than this amount for Natera tests, and convey this information to patients. Natera is aware that this misinformation about the cost of its tests is routinely communicated from providers to patients, and encourages these communications.

37.     Natera's bills to patients reflect Natera's awareness that patients may be hearing about Natera for the first time when they receive a bill from Natera. To wit, there is a section on the back of Natera's bills that reads: "Who is Natera? Natera offers non-invasive genetic testing services. Your physician is uncompromising in patient care and asked us to perform important tests on a blood sample collected during your office visit." It further reads: "Why did I receive a Natera Statement? You are receiving a statement/bill from Natera because genetic testing services were performed, on your behalf, at the request of your physician."

38.     Natera sets the prices of its tests and determines the amount to charge insurers and patients for those tests, and also determines what to communicate to patients and providers about the cost of its tests.

39.     In addition, Natera will also bill in-network patients exorbitant and improper charges. In these bills, Natera misleadingly claims that the patient's insurance did not cover the test, when in reality, it is Natera that failed to obtain required pre-authorization from the insurer(s). Consequently, patients who should owe nothing for the test, or only a co-pay, are hit with a surprise bill stating that they owe much more than what they expected.

40.     Natera is aware of its obligation to obtain pre-authorization, but intentionally or recklessly does not obtain that pre-authorization. Natera's practice of billing in-network patients is an attempt to circumvent its pre-authorization obligations with insurers by improperly and fraudulently obtaining payment directly from patients.

**Experiences with Natera's Billing Policy**

<u>Plaintiff Elizabeth Copley</u>

41.     For her second pregnancy, Copley received OB/GYN care from a physician's practice in New Milford, Connecticut.  This practice has maintained a direct relationship with Natera.  A Natera representative informed the practice that the out-of-pocket cost to patients for any Natera tests not covered by insurance would be $250.  As expected, the practice passes this information along to patients on behalf of Natera.

42.     In late 2019, when Copley was pregnant with her second child, the nurse practitioner at Copley's then-OB/GYN's office advised her to do the Natera Panorama Non-Invasive Prenatal Testing panel ("Panorama panel") due to her age.

43.     Copley and her husband viewed a brochure about this test while in the office, but Copley does not believe it contained any specific information about the test's price or cost.

44.     Upon specifically inquiring how much the test would cost, the nurse practitioner assured Copley that it would not cost more than $250, at most.

45.     Copley has been told by her former OB/GYN's office that the information on the cost of the Natera test was based on statements and representations made to the OB/GYN's office by Natera's representative.

46.     Copley relied on this assurance about the price of the test and, based on that assurance, agreed to get her blood drawn for the "Panorama Prenatal Screen with Microdeletions" panel (procedure codes: Fetal Chromosomal Aneuploidy with Microdeletions 81420HA, 81422HA) on October 22, 2019.

47.     There was no discussion between Copley and anyone at her OB/GYN's office about whether she wanted to run the test through insurance or self-pay; the practice had her insurance details and, just like her other bloodwork, the Natera test was also run through her insurance.

48.     Copley did not hear anything further about or from Natera until she noticed a charge of $8,000 on an Explanation of Benefits ("EOB") statement from her insurer, Connecticare, in late 2019 or early 2020. The EOB was for the plan year 01/01/2019 to

12/31/2019. Natera had billed Connecticare $3,900 for Pathology services and $4,100 for Laboratory services in connection with the Panorama panel. Connecticare denied the claim entirely, transferring potentially the entire charge onto Plaintiff.

49.     Copley was shocked to see these exorbitant charges and by the fact that the entire charge could potentially become her responsibility. Her husband, Charles Copley, called Connecticare inquiring about the charge. Connecticare advised him to call Natera.

50.     Charles Copley then called Natera inquiring about the charge. He informed the Natera representative to whom he spoke that he and his wife were completely unaware that they could be charged thousands of dollars for the Panorama panel, a situation vastly different from what Copley's OB/GYN's office had earlier represented to Copley about the cost of the test.

51.     The Natera representative responded saying that Copley would be charged $249 for the test, thereby confirming the pricing that Plaintiff had been told by her OB/GYN's office. The Natera representative never advised Plaintiff or Plaintiff's husband that her doctor's office was mistaken, had misspoken, or had otherwise given any incorrect information to Plaintiff about Natera's prices.

52.     However, over a year and a half later, Natera sent Copley a bill dated July 9, 2021 for $721.10 for the very same test, more than double the amount quoted by Natera's representative. The bill was due on August 8, 2021.

53.     After receiving the bill from Natera, Charles Copley called Natera again, and expressed that he thought he had already paid the bill.

54.     However, Natera sent Copley a second bill dated August 16, 2021 for $721.10, due upon receipt.

55.     Natera then sent Copley a third bill dated September 17, 2021 for $721.10, due upon receipt.  This bill stated that the bill was "past due," and further stated: "To prevent your account from going to a professional collections agency, please submit payment for the amount due immediately."

56.     In response to these bills, Copley made one payment of $50 to Natera by check, noting on the check that it was paid under protest.

57.     Copley later received a bill dated October 24, 2021 for $671.10, due immediately. This bill stated that it was a "final notice," and further stated: "To prevent your account from going to a professional collections agency, please submit payment for the amount due immediately." While Copley disputes that she owes this amount to Natera, it is her understanding that Natera expects that she will pay this bill, and that it could be sent to collections at any time. Natera has not retracted this bill.

58.     All of the bills that Natera sent to Plaintiff were sent from, and payable to, Natera at PO Box 399023, San Francisco CA 94139-9023.

59.     Based on Natera's conduct, i.e. the fact that Natera had a relationship with Plaintiff's former OB/GYN's office and sent Plaintiff a bill, it is evident that Natera believed it was authorized to send Plaintiff a bill and also believed that Plaintiff was obligated to pay it.

60.     Had Plaintiff been aware of the true price of the test and the amount she would be charged by Natera, she would not have agreed to do the test, and thus would not have paid Natera any money at all.

61.     Plaintiff's current OB/GYN told Plaintiff that his office also deals directly with Natera, and has likewise been told by Natera that the out-of-pocket cost to patients for Natera tests would not exceed $250, confirming that this misrepresentation comes from Natera.

62.     Plaintiff is open to a future pregnancy, and if she were to become pregnant again, she would choose to undergo genetic testing to ensure her child's health, including Natera testing if appropriate, but only if she could be sure of the price of the test.

Other experiences

63.     Just like Plaintiff, there have been hundreds, if not thousands, of women who have had similar horrific experiences with Natera. For instance, websites including Yelp, Better Business Bureau ("BBB"), Reddit, and What to Expect are filled with negative experiences by patients who have been traumatized by Defendant's deceptive and fraudulent billing practices, which include: concealing the price of a Natera genetic test; surprise balance billing patients after recovering a portion from third-party payors (i.e. insurance companies); misleading patients about their out-of-pocket costs for a Natera genetic test; making false statements regarding Natera's

Price Transparency Program; and harassing patients by repeatedly sending bills even after they have paid Natera's "prompt pay" discount in exchange for the rest of charges being waived.

64.     Online reviews on Yelp (yelp.com/biz/natera-san-carlos, accessed on February 8, 2022 and September 14, 2022) confirm that Natera's billing practices are consistent, longstanding, and affecting patients throughout the country.

65.     One Yelp reviewer, in a review dated June 26, 2020, wrote: "Terrible company who preys on vulnerable families. We received a bill for $1,590 despite our OBGYN saying the cost is $249 if insurance does not cover it. When we called customer support they confirmed that the rate was $249 but because we didn't respond within 30 days the pricing went up to $1,590. How is that even possible? Stay as far away as you can."

66.     Another Yelp reviewer, in a review dated July 7, 2021, wrote: "[W]hat Natera is doing takes the cake. They advertise this 'Price Transparency Program' and tell ordering providers that at most the test will cost us $249 if insurance doesn't pay. What they advertise is, someone checks the coverage/benefits, makes an estimate, and contacts the patient if it might be in their interest to pay self-pay at $249. What they ACTUALLY do is, per the authorization to file insurance you sign on the order, file your insurance and if your insurance pays they take that money and if your insurance leaves you more than $249 out-of-pocket you get a one-time offer for a prompt pay discount of $249, then they go back to trying to bill you the massive coinsurance. In our case insurance paid them over $2k and left us about $1800. They used that $1800 and the fact that my wife authorized insurance to be filed (in the event that it would be better for us than $249) to extort us for the additional $249."

67.     In a Yelp review dated January 13, 2022, a reviewer remarked: "Super funny how on the forms you fill out before sending in the sample says 'if your insurance doesn't cover the cost, your maximum payment will be $249', the. [sic] You get a bill in the mail that says you owe over $2700, but your insurance paid over $600 already. When I called and asked what happened the lady on the line goes, we can offer you the $249 deal, but you have to pay with a credit card now.[]  Not sure why I still have to pay $249 when they already stole over $600 from BCBS. Very strange, I'd like some answers from them, but no one speaks English on the hotline."

68.     On Natera's Better Business Bureau ("BBB") profile (https://www.bbb.org/us/ca/san-carlos/profile/laboratory-research/natera-1116-537368/complaints,  accessed on Oct. 27, 2021 and September 14, 2022), patients' reported experiences are no different.

69.     One BBB reviewer wrote: "We were told by our fertility clinic for genetic testing out of pocket cost would be $200 each test which we had 2 done mine and my spouse. We were given a paper with this information and told the genetic testing company would contact us once talking to our insurance and [if] it was more than $200 we could do the self-pay option. Nobody ever contacted us and they billed each of our insurance over $14,000 and now insurance is stating we owe an upward of $7000. Nobody ever contacted us to tell us this and offer us the self-pay option……"

70.     Another BBB reviewer wrote on August 14, 2022:  "Was told the test would only cost $250 and that my insurance covers the cost 100%. 6 months later the charge is finally charged to my insurance for $3900. This charge was also denied through my insurance. Natera mislead me in the cost and coverage of this testing. I was baited and taken advantage of to get me to agree to this test and now in stuck with a large [bill] I cannot afford to pay."

71.     The Capitol Forum, an investigative news organization located in Washington, D.C., published an article on August 5, 2021, entitled "Natera: Experts Raise Concerns About Size of Prompt Pay Discounts and Company Billing Practices."  This article discusses the experience of multiple patients who were billed hundreds or thousands of dollars more than Natera's advertised cash price of $249 for its tests.  The article noted that "Natera patients interviewed by The Capitol Forum shared similar stories regarding Natera's price transparency program and prompt payment discounts. All said that the amounts Natera charged both their insurers and them were far above what they had initially been told by the company, and that Natera sent almost daily emails reminding them to pay."  The article also referred to a "fertility clinic in California," which had a "business relationship with Natera," and reported that the clinic "'received a lot of complaints from patients regarding Natera's billing practices'" because Natera would improperly "'send a bill ranging from $600 to $1000 to both [the clinic] and the patient

1    more than 50% of the time. . . . They harass the patient and they tell them the clinic hasn't paid

2    and you need to pay the bill, calling and emailing them every day, even when [the clinic] already

3    paid the bill sent to [the clinic].'"

4        72.    Patients generally encounter Natera's misrepresentations only before or during

5    pregnancy. Due to the time it takes to carry a pregnancy to term, and the inherent contingencies

6    involved in family planning, patients who have been harmed by Natera's misrepresentations

7    cannot be sure if, or exactly when, they will encounter Natera's misrepresentations again. This is

8    because patients may not choose to become pregnant again, but if they do, there is no guarantee

9    of success, nor can it be predicted when a patient may become pregnant again and want or need a

10   Natera test in the future.

11       73.    As described herein, Natera knows that the price of its tests is a material piece of

12   information to patients, and intentionally deprives patients of this information.  Instead, Natera

13   directly or indirectly falsely promises them a lower price, with the intention of inducing them to

14   undergo its tests with the expectation of an affordable price, only to bill them for an egregiously

15   higher amount at a time when they are already under considerable stress, to patients' financial

16   harm and Natera's benefit.

17       74.    Given the circumstances described hereinabove, Defendant's misconduct is

18   malicious, oppressive, and/or fraudulent.

19       75.    Defendant's conduct constitutes malice because it is intended by the Defendant to

20   cause injury to the plaintiff and/or is despicable conduct which is carried on by the Defendant

21   with a willful and conscious disregard of the rights or safety of others.

22       76.    Defendant's conduct constitutes oppression because it is despicable conduct that

23   subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

24       77.    Defendant's conduct constitutes fraud because Defendant is committing an

25   intentional misrepresentation, deceit, or concealment of a material fact known to the Defendant

26   with the intention on the part of the Defendant of thereby depriving a person of property or legal

27   rights or otherwise causing injury.

28

78.     Natera's deceptive billing practices, as alleged herein, continue through the present day.

**CLASS ACTION ALLEGATIONS**

79.     Plaintiff brings this suit as a class action on behalf of herself and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and/or 23(b)(3).

80.     Plaintiff seeks to represent a nationwide class comprising of all persons in the United States who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that test (the "Class").

81.     Upon completion of discovery with respect to scope of the Class, Plaintiff reserves the right to amend the Class definitions. Excluded from the Class are Defendant, its parents, subsidiaries and affiliates, directors and officers, and members of their immediate families.

82.     The members of the Class are so numerous that the joinder is impracticable. It is believed that at a minimum, thousands of persons across the United States have received bills in excess of $249 from Natera for these genetic tests, and thousands more will continue to be subjected to these exorbitant bills if Defendant's practices are not stopped. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant (and, to the extent applicable, third party retailers and vendors).

83.     Plaintiff's respective claims are typical of the claims of the Class because she had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and was then billed more than $249 for that test.

84.     Plaintiff will fairly and adequately represent and protect the interests of the other Class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff has no interests antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel experienced in litigation of this nature.

85.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including, but not limited to:

a.      whether Defendant misrepresents its billing and pricing policy to patients, either directly or through patients' medical providers, through its brochures and other channels of marketing;

b.      whether Defendant conceals the extremely high price it charges for its genetic panels, thereby deceiving class members into choosing to perform the genetic panels;

c.      whether Defendant's conduct constituted an unfair, unlawful, and/or fraudulent business practice in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.;

d.      whether Defendant's conduct violated the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.;

e.      whether Defendant was unjustly enriched as a result of Defendant's conduct;

f.      whether Defendant's conduct damaged members of the Class and, if so, the measure of those damages; and

g.      whether Defendant's practices in connection with billing of its genetic panels should be enjoined.

86.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

87.     Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Defendant has acted on grounds that apply generally to the Class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

88.     Class members have suffered and will suffer irreparable harm and damages as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT I

**Violations of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, et seq.**

89.     Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

90.     Plaintiff asserts this cause of action against Defendant for unlawful, unfair and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (the "UCL").

91.     Defendant's conduct violates the UCL, as the acts and practices of Defendant constitute a common and continuing course of conduct by means of "unlawful" "unfair" and "fraudulent" business acts or practices within the meaning of the UCL.

92.     Defendant's conduct is fraudulent and thus amounts to unfair competition as set forth in the UCL, in that Defendant conceals the price of its genetic tests and misrepresents the price patients would potentially have to pay for its genetic tests. Such misrepresentations and omissions are likely to deceive, and in fact have deceived, thousands of patients.

93.     Defendant's conduct is unlawful, and thus amounts to unfair competition as set forth in the UCL, in that it violates, among other things, California Civil Code §§ 1572, 1709 and 1710, as well as California Business & Professions Code § 17500. As described above, Defendant willfully deceived Plaintiff and Class members by misrepresenting the price patients would potentially have to pay for its genetic tests, concealing the amount it charges for its genetic tests, and misrepresenting its billing practice with the intent to induce them to alter their positions to their injury. Defendant's representations were untrue and misleading and Defendant knew, or by exercising reasonable care should have known, such representations were untrue and misleading.

1    Defendant disseminated these untrue and misleading representations as part of a plan or scheme

2    with the intent not to sell its services as so marketed.

3        94.    Defendant knowingly received and retained wrongful benefits and funds from

4    Plaintiff and members of the Class. Therefore, the Defendant acted with conscious disregard for

5    the rights of Plaintiff and members of the Class.

6        95.    Defendant's conduct is unfair, and thus amounts to unfair competition as set forth

7    in the UCL, in that it is immoral, unethical, oppressive, unscrupulous and substantially injurious

8    to patients who end up with unexpected huge bills that cause severe financial distress.

9        96.    As a direct and proximate cause of Defendant's violations of the UCL, Plaintiffs

10   and the Class suffered an injury in fact and have suffered monetary harm. Defendant, on the other

11   hand, has been unjustly enriched and should be required to make restitution to Plaintiff and the

12   class and/or disgorge its ill-gotten profits pursuant to Business & Professions Code § 17203.

13       97.    Defendant's unlawful, unfair, and fraudulent business practices, as described

14   herein, present a continuing threat to Plaintiff, the Class and the general public in that Defendant

15   continues to misrepresent the price and out-of-pocket expenses that patients would have to bear

16   for its genetic tests. In addition, Defendant has been unjustly enriched as a result of its conduct.

17       98.    A constructive trust should be imposed upon all wrongful or inequitable proceeds

18   received by Defendant traceable to Plaintiff and members of the Class.

19       99.    Plaintiff and the class seek equitable relief because they have no other adequate

20   remedy at law. Absent equitable relief, Defendant will continue to injure consumers, and harm the

21   public's interest, thus engendering a multiplicity of judicial proceedings.

22       100.   Plaintiff further seeks an order enjoining Defendant from engaging in any unlawful

23   or inequitable acts and practices as alleged herein, because of Defendant's continuing

24   misrepresentations and improper billing practices.

25

26

27

28

**COUNT II**

**Violations of the California Consumer Legal Remedies Act**

**Cal. Civ. Code §§ 1750, et seq.**

101.    Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

102.    The conduct of Defendant alleged above constitutes an unfair method of competition and unfair or deceptive act or practice in violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA").

103.    Defendant is a person as defined by Cal. Civ. Code § 1761(c).

104.    Plaintiff and Class members are consumers as defined by Cal. Civ. Code § 1761(d).

105.    Defendant's genetic testing services described above constitutes a service as defined by Cal. Civ. Code § 1761(b).

106.    Plaintiff's purchase was a transaction under Cal. Civ. Code § 1761(e).

107.    The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which, among other instances enumerated in the CLRA, include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)); or "a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law" (§ 1770(a)(14)).

108.    Defendant's conduct violates Cal. Civ. Code § 1770(a)(5) in that Defendant misrepresented that its services had the characteristics of price transparency, which in fact they did not have. Defendant violated Cal. Civ. Code § 1770(a)(9) in that it falsely advertised its service to be affordable and price transparent. Further, it falsely advertised that it would offer patients the option of a cash discount if it found patients owed higher amounts through insurance. In reality, it had no intention of informing patients of the expected charges if put through

insurance nor intended to be transparent about the price of its services.  Defendant violated Cal. Civ. Code § 1770(a)(14) in that it represented its transactions with patients involved rights and obligations regarding price transparency which, in fact, they did not have or involve.

109.    The representations and omissions set forth above are of material facts that a reasonable person would have considered important in deciding whether or not to purchase Defendant's services. Plaintiff and class members justifiably acted or relied upon Defendant's misrepresentations and omissions to their detriment.

110.    Plaintiff and the other members of the Class have been, and continue to be, injured as a direct and proximate result of Defendant's violations of the CLRA.

111.    Plaintiff is entitled to pursue a claim against Defendant on behalf of the Class to enjoin Defendant from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1780(a) and § 1781, as well as to pursue costs and attorneys' fees under § 1780(e).

112.    On November 19, 2021, Plaintiff served Defendant with written notice of its CLRA violations pursuant to Cal. Civ. Code § 1782, via letter sent by certified mail, return receipt requested. After the requisite thirty days, Defendant failed to respond to the CLRA notice letter, and did not make any appropriate correction, repair, replacement, or other remedy. Pursuant to Cal. Civ. Code § 1782, Plaintiff is thus entitled to seek damages at this time. Accordingly, Plaintiff seeks damages on behalf of herself and the Class as permitted by Cal. Civ. Code § 1782.

## COUNT III

### Breach of Implied Contract or Quasi-Contract

113.    Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

114.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

115.    A contract is implied by law between the Defendant and the Plaintiff and Class members, entitling Plaintiff and Class members an accurate representation of the charges for Defendant's services.

116.     A contract is also implied by law between the Defendant and the Plaintiff and Class members, entitling Defendant to fair market or reasonable value of the testing services rendered (the quantum meruit of the services performed).

117.     Defendant breached the terms of the implied contract by billing Plaintiff and Class members at excessive rates, much higher than reasonable value implied in law, which Plaintiff and Class members were completely unaware of.

118.     By means of Defendant's wrongful conduct alleged herein, Defendant knowingly misrepresented the charges for its genetic tests in a manner that was unfair, unconscionable and oppressive, and knowing the charges would have had an influence in the consumers' decision to purchase the service.

119.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

120.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of charges upon members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds, under circumstances making it inequitable to do so, constitutes unjust enrichment.

121.     Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class. Therefore, the Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

122.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

123.     The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Class. Defendant should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched Defendant.

1    124.    A constructive trust should be imposed upon all wrongful or inequitable proceeds

2    received by Defendant traceable to Plaintiff and members of the Class.

3    125.    Plaintiff further seeks an order enjoining Defendant from engaging in any unlawful

4    or inequitable acts and practices as alleged herein, because of Defendant's continuing

5    misrepresentations and improper billing practices.

6    126.    Plaintiff and members of the Class have no adequate remedy at law.

7    **PRAYER FOR RELIEF**

8    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated,

9    requests that the Court award the following relief:

10    a.    Certify this action as a class action pursuant to Federal Rule of Civil

11    Procedure 23, appoint Plaintiff as representative of the Class, and designate the

12    undersigned as Class Counsel;

13    b.    Declare Defendant's conduct unlawful and enter an order enjoining the

14    Defendant from continuing to engage in the conduct alleged herein;

15    c.    Award Plaintiff and the Class damages, including punitive damages

16    pursuant to Cal. Civ. Code 3294;

17    d.    Award Plaintiff and the Class restitution and/or disgorgement;

18    e.    Award pre-judgment and post-judgment interest;

19    f.    Grant Plaintiff and the Class payment of the costs of prosecuting this

20    action, including expert fees and expenses;

21    g.    Grant Plaintiff and the Class payment of reasonable attorneys' fees; and

22    h.    Grant such other relief as the Court may deem just and proper.

23    ///

24    ///

25    ///

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff and the Class members demand a trial by jury on all triable issues.

3

DATED: September 16, 2022                           Respectfully submitted,

4

**BERMAN TABACCO**

5

Joseph J. Tabacco, Jr.
6       Kristin J. Moody
         Alexander S. Vahdat
7       425 California Street, Suite 2300
         San Francisco, CA 94104
8       Telephone: (415) 433-3200
         Facsimile: (415) 433-6382
         Email: jtabacco@bermantabacco.com
9                     kmoody@bermantabacco.com
                       avahdat@bermantabacco.com
10

11      *Attorneys for Plaintiff and the Proposed Class*

         WOLF POPPER LLP
12

13      By: /s/ Patricia Avery
         Patricia Avery (admitted *Pro Hac Vice)*
14      Philip M. Black (SBN 308619)
         **WOLF POPPER LLP**
15      845 Third Avenue
         New York, NY 10022
16      Telephone: (212) 759-4600
         Facsimile: (212) 486-2093
17      Email: pavery@wolfpopper.com

18      *Attorneys for Plaintiff and the Proposed Class*

19

20

21

22

23

24

25

26

27

28