United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**ELIZABETH COPLEY**, *et al.*,
Plaintiff,

v.

**NATERA, INC.**,
Defendant.

Case No. 4:21-cv-08941-YGR

**ORDER DISMISSING CASE FOR LACK OF ARTICLE III STANDING**

Re: Dkt. No. 57

Defendant Natera, Inc. has filed a Motion to Dismiss plaintiff Elizabeth Copley's Second Amended Class Action Complaint ("SAC") alleging violations of the California Unfair Competition Law ("UCL") and California Consumer Legal Remedies Act ("CLRA") and seeking equitable and injunctive relief. (Dkt. No. 57.) A core issue raised is whether plaintiff has Article III standing for her claims and the remedies she seeks based on the following factual allegations: (i) plaintiff was told by her healthcare provider that taking one of defendant's genetic tests would cost no more than $250; (ii) she then underwent the test; and (iii) after receiving a bill for more than $250, plaintiff paid only $50 under protest. In addition to Article III standing, the parties dispute whether plaintiff has satisfied state statutory standing requirements for her UCL and CLRA claims. Briefing has at times conflated these two inquiries.

Having carefully considered these two issues and the pleadings in this action and for the reasons below, the Court finds that plaintiff lacks Article III standing and therefore that her case is **DISMISSED WITHOUT PREJUDICE** to being filed in state court.

## I. STANDARD

The standard for evaluating a motion to dismiss and the pleading standard for claims, such as these, that sound in fraud, are well known and not in dispute.

In order to expedite the issuance of this Order, the Court assumes the parties' familiarity with the allegations in the SAC. The Court will focus herein on the dispositive allegations.

United States District Court
Northern District of California

## II. LEGAL FRAMEWORK

To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Notably, Article III "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing ***for each claim*** that they press ***and*** for ***each form of relief*** that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 (2021) (emphasis supplied). Moreover, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992)).

The Supreme Court's decision in *TransUnion* redefined the inquiry into what satisfies this concrete harm requirement as a matter of *federal* law. The Supreme Court instructed that, to determine whether an alleged harm is sufficiently concrete, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts," such as physical harm, monetary harm, or various intangible harms. *TransUnion*, 141 S.Ct. at 2204. This inquiry focuses on "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury . . . . but does not require an exact duplicate in American history or tradition." *Id.*

*TransUnion* also requires nuance as to the remedy sought. As the Supreme Court explained, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id*. at 2210 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). The Supreme Court credited, however, the argument that, where a plaintiff brings "a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm." *Id*. at 2210-11 (emphasis in original).

## III. ANALYSIS

The Court notes in overview that briefing on the pending motion glosses over the framework set forth in *TransUnion* and outlined above. For instance, plaintiff has failed to specifically identify *any* common law analogue(s) to justify the remedies she seeks under the UCL and CLRA. Nor do the state appellate decisions she relies upon to assert state statutory standing speak to the framework set forth in *TransUnion*. Defendant, meanwhile, focuses primarily on whether plaintiff has alleged a concrete injury sufficient to establish state statutory standing while only briefly touching on Article III standing in the context of plaintiff's request for injunctive relief. The Court includes in its analysis the standing framework established by the Supreme Court in *TransUnion*.

### A. UCL and CLRA Claims

Based upon the allegations in her SAC, it appears the closest common law analogue to plaintiff's UCL and CLRA claims is fraudulent misrepresentation (briefly mentioned by plaintiff). The Court therefore analyses plaintiff's allegations to determine whether she alleges harm which, under the common law of fraudulent misrepresentation, would constitute concrete injury sufficient to establish Article III standing under *TransUnion*.

#### i. *Natera's Alleged Misrepresentations to Plaintiff*

At common law, a plaintiff bringing a claim "of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to [her] of which the misrepresentation is a legal cause . . . ."[1] Rest. 2d of Torts § 549(1). Assuming without deciding that plaintiff's $50 protest payment to defendant constitutes pecuniary loss,[2] or that she would not have undergone defendant's testing or made any payments to defendant had she known

[1] Relevant to plaintiff's UCL and CLRA claims, such damages may include "pecuniary loss suffered *otherwise as a consequence of* the recipient's reliance upon the misrepresentation." Rest. 2d of Torts § 549(1)(b) (emphasis supplied).

[2] As the Court determines that plaintiff has not sufficiently pled reliance on any alleged misrepresentations by Natera, it declines to reach whether plaintiff has suffered a cognizable injury for the purposes of Article III standing, including whether her unpaid medical bill, without more, constitutes injury-in-fact.

the true cost of the test,[3] she has not plausibly alleged any ***reliance*** on defendant's conduct. Plaintiff's SAC indicates that she "relied on" the "assurance" of her "nurse practitioner . . . that [the genetic test at issue] would not cost more than $250, at most." (SAC ¶¶ 44-46.) Plaintiff therefore does not allege that she relied on *any* direct misrepresentations made to her by defendant when deciding whether to undergo genetic testing offered by defendant.[4] This alone, however, does not end the inquiry of whether plaintiff has sufficiently alleged concrete harm under the common law of fraudulent misrepresentation to establish Article III standing.

*ii. Misrepresentations Allegedly Made by Natera through Plaintiff's Nurse Practitioner*

Common law also recognizes that misrepresentations made to a third person may give rise to cognizable injury in limited circumstances. Again, turning to the Restatement, "[t]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." Rest. 2d of Torts § 533.

---

[3] Plaintiff relies upon the proposition that standing is satisfied where plaintiffs contend that they "paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so," to suggest that she has standing. *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 595 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022); *see also Hinojosa v. Kohl's Corp*., 718 F.3d 1098, 1107 (9th Cir. 2013) (recognizing that "when a consumer purchases [a product] on the basis of false price information, and when the consumer alleges that he would not have made the purchase but for the misrepresentation, he has standing to sue under the UCL and [Fair Advertising Law] because he has suffered an economic injury"). However, *Mazza* was set forth in the context of the standing of a class that had been previously certified. Both cases also considered the plaintiff's degree of reliance, which here is extremely attenuated and not plausible.

[4] Plaintiff alleges she "and her husband viewed a brochure about [Natera's] test while in the [nurse practitioner's] office, but [plaintiff] does not believe it contained any specific information about the test's price or cost." SAC ¶ 43. The Court does not view this brochure as relevant to the reliance inquiry as plaintiff does not argue the brochure contained price information on which she could have relied. Relatedly, plaintiff also alleges her husband spoke directly with a Natera customer service representative about the cost of the testing after plaintiff received an Explanation of Benefits statement from her insurer. *Id.* ¶¶ 48-51. However, as this conversation occurred *after* the testing had been completed, it is immaterial to the Court's reliance analysis of plaintiff's decision whether to undergo the testing in the first instance.

To support standing, plaintiff urges a theory similar to that outlined in the Restatement. She alleges that misrepresentations about the price of the genetic test made to her by her nurse practitioner should be imputed to Natera, and therefore that Natera should be held accountable for such statements. (Dkt. No. 60, Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opp.") at 4:22-23.) Further, she asserts that her healthcare provider's "practice maintained a direct relationship with Natera" and that "[a] Natera representative informed the practice that out-of-pocket cost to patients for any Natera tests not covered by insurance would be $250." (SAC ¶ 41.) Plaintiff then asserts that, "[a]s expected, the practice passes [such pricing] information along to patients on behalf of Natera." (*Id.*) Plaintiff therefore invites the Court (i) to infer that the pricing information provided to her by her nurse practitioner originated with defendant, and (ii) to accept plaintiff's allegation that her decision to undergo defendant's genetic testing constitutes reliance on the pricing information, which she asserts was not in fact accurate.

The Court declines to do so for two reasons. *First*, plaintiff's own pleadings undermine the plausibility of her argument because she admits the price information she received from her healthcare provider differed from public-facing statements made by defendant about the affordability of their genetic tests. Plaintiff's SAC refers to at least three public representations defendant has allegedly made about the price of the genetic test at-issue. She alleges that "a version of Natera's Panorama / Horizon Patient Brochure" discloses that "the majority of patients have an out-of-pocket expense between $100 and $200 for each test, once their deductible has been met," and that ***"[s]ome patients will owe more, many will owe less***."[5] (*Id.* ¶ 31 (emphasis supplied).) Plaintiff also alleges a separate Natera brochure states that "the ***average*** out-of-pocket costs" for their genetic test "is between $100-249." (*Id.* ¶ 35 (emphasis supplied).) Plaintiff's takeaway from these materials is that defendant Natera "give[s] patients a false sense of comfort that their out-of-pocket expenses will not exceed roughly ***a couple of hundred dollars***." (*Id.* ¶ 33 (emphasis supplied).) However, plaintiff significantly overstates the persuasive value of these

[5] Plaintiff alleges the phrase "[s]ome patients will owe more, many will owe less" appeared "[a]t the bottom of the page, in significantly smaller font, . . . following an asterisk . . . ." *Id.* ¶ 31. The Court reviewed the relevant page of the brochure and finds this text was not so small or otherwise concealed as to render its appearance in the brochure relevant to the reliance inquiry.

brochures, which in fact undermine her claims. The logical inference from these statements is that some patients will in fact pay more than $250 for the genetic test. Plaintiff has therefore pointed to no representation from Natera that the at-issue genetic test would *not* cost patients more than $250, and which could have plausibly been passed on through to her by her nurse practitioner.

*Second*, plaintiff's SAC contains no allegations which would explain why plaintiff's nurse practitioner might have provided her pricing information that differs from defendant's repeated and consistent public statements regarding the cost of their test. She has not, for instance, alleged that her healthcare provider's practice has a special relationship with Natera through which patients are entitled to different or lower cost genetic testing options. Without supportive factual allegations and against the backdrop of conflicting public statements by Natera regarding the cost of their tests, the Court cannot credit plaintiff's argument that alleged misrepresentations as to the price of Natera genetic tests made to plaintiff by her nurse practitioner must be imputed to Natera.

*Third*, contrary to plaintiff's contentions, the caselaw does not support her theory. Plaintiff cites to five district court cases for the proposition that defendants like Natera can and should be held accountable for alleged misrepresentations made on their behalf by third parties. Each are distinguishable.[6] As a representative example, the Court examines *Shay v. Apple*, in which the district judge analyzed whether Apple could be held accountable for certain business practices that failed to prevent malicious actors from draining Apple gift cards of value once purchased (including from a retailer) and activated. 512 F.Supp.3d 1066 (2021).

The court in *Shay* focused on plaintiff's allegations that Apple, when putting the gift cards into the stream of commerce, purportedly failed to implement effective security measures and "concealed the security deficiencies [related to the gift cards] as to cause customers to believe that

---

[6] Plaintiff also cites *Kamal v. Eden Creamery, LLC*, 2019 U.S. Dist. LEXIS 107263, at *11-*17 (S.D. Cal. June 26, 2019); *Howard v. First Horizon Home Loan Corp*., 2013 U.S. Dist. LEXIS 167715, at *15 (N.D. Cal. Nov. 25, 2013); *Makaeff v. Trump Univ., Ltd. Liab. Co*., 145 F. Supp. 3d 962 (S.D. Cal. 2015); see also *Woodard v. Librada*, 2017 U.S. Dist. LEXIS 124546, at *9 (C.D. Cal. July 31, 2017). *Kamal*, *Makaeff*, and *Woodard* are not binding on this Court and, having been issued prior to the Supreme Court's opinion in *TransUnion*, do not apply the standing framework the high court established in that case. *Howard*, as a negligent misrepresentation case, is beyond the scope of this proceeding.

United States District Court
Northern District of California

they would be able to use their gift cards as anticipated." *Id.* at 1072. Because plaintiffs plausibly pled "defendant's liability for unfair business practices . . . based on [their] personal participation in the unlawful practices and unbridled control over the practices," the court denied Apple's motion to dismiss the proceedings. *Id.* at 1071-72 (quotations & citation omitted). The court reasoned that Apple's "unbridled control" over the business practices at-issue made them potentially liable to plaintiffs even when plaintiffs purchased the Apple gift cards from retailers. *Id.* Unlike in *Shay*, plaintiffs in the instant case have not plausibly pled that Natera exercised "unbridled control" over the flow of price information downstream, through plaintiff's nurse practitioner, to plaintiff and other patients. In fact, as discussed above, plaintiff makes sparse factual allegations connecting Natera to plaintiff's healthcare provider, and furthermore has not accounted for the discrepancies between information provided plaintiff by her nurse practitioner and the information defendant makes publicly available concerning the cost of their genetic test. As such, plaintiff's allegations are unlike Apple's business practices in *Shay*.

* * *

Since plaintiff has not pled sufficient facts to support her contention that she relied on misrepresentations made directly or indirectly by Natera regarding the price of their genetic test, she has not met her burden to establish Article III standing on her UCL and CLRA claims. Her speculation about what her nurse practitioner may[7] have been told by Natera about the price of the genetic test, without more, is insufficient to confer standing on plaintiff for her UCL and CLRA claims against defendant.

///

///

[7] Plaintiff appears to concede that she did not know about any relationship between Natera and her nurse practitioner's office when she decided to do the test. Instead, her pleadings suggest she may have had conversations with her nurse practitioner's staff after the fact. *See* SAC ¶ 45 (alleging that "Copley ***has*** been told by her former OB/GYN's office that the information on the cost of the Natera test was based on statements and representations made to the OB/GYN's office by Natera's office" as opposed to alleging Copley ***was*** told about such a relationship when first informed about the costs of genetic testing by Natera (emphasis supplied).) Thus, any reliance is significantly attenuated.

United States District Court
Northern District of California

B. Equitable Remedies

The Court now turns to whether plaintiff has Article III standing to bring quasi-contract "claims" for restitution or to seek injunctive relief.

i. *Restitution*

Plaintiff brings a claim for "Breach of Implied Contract or Quasi-Contract" and asks the Court to "[a]ward Plaintiff and the Class restitution and/or disgorgement[,]" "[d]eclare [d]efendant's conduct unlawful[,] and enter an order enjoining [Natera] from continuing to engage in [their alleged misrepresentations]." (SAC 23:13-14, 17.) "Under the law of restitution, '[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another.'" *McBride v. Boughton, et al.*, 123 Cal.App.4th 379, 389 (2004) (citation omitted) (alteration in original). "[T]he fact that one person benefits another is not, by itself, sufficient to require restitution." *Id.* (citation omitted). Instead, "[t]he person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." *Id.* (citation omitted) (emphasis in original). "[W]hile there is not a standalone cause of action for unjust enrichment, . . . [w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Doe v. Epic Games, Inc.*, 435 F.Supp.3d 1024, 1052 (N.D. Cal. 2020) (citation omitted).

Plaintiff's arguments relating to the existence of a quasi-contract and necessity of restitution are confusing and strain the doctrine of equitable remedies. She contends that an implied-in-law contract exists between defendant and plaintiff pursuant to which defendant is entitled "to fair market or reasonable value of the testing services rendered," and that this contract was breached when defendant billed plaintiff "at excessive rates, much higher than reasonable value implied in law." (SAC ¶¶ 115-17.) Plaintiff then alleges that restitution is an appropriate remedy because "Natera directly or indirectly falsely promises [patients] a lower price [for their genetic test], with the intention of inducing them to undergo its tests with the expectation of an affordable price, only to then bill them for an egregiously higher amount . . . ." (*Id.* ¶ 73.) Further, she asserts that, "[a]s a result of [their] wrongful conduct . . . [d]efendant has been unjustly enriched at" plaintiff's expense, and defendant should therefore "be compelled to provide [as]

restitution . . . all proceeds received from [p]laintiff and the [putative] [c]lass . . . as a result of any unlawful or inequitable act [ ] that unjustly enriched [them]."[8] (*Id.* ¶¶ 119, 123.)

The Court finds plaintiff's allegations deficient because they fail to establish why plaintiff is entitled to restitution as an equitable remedy. At common law, the "difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution." *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 131 (2009) (citation omitted). Here, plaintiff paid only $50 for Natera's genetic test, despite being prepared to pay up to $250, or five times more, to undergo the test on the advice of her nurse practitioner. (SAC ¶ 7.) Considering this, plaintiff has not overpaid, and the interests of equity do not mandate she be awarded restitution.[9] The Court therefore finds that plaintiff has not pled facts which establish Article III standing to state a claim for restitution.[10]

ii. *Injunctive Relief*

Plaintiff seeks injunctive relief in the form of an order to enjoin defendant "from engaging in any unlawful or inequitable acts and practices" resulting from their "continuing misrepresentations and improper billing practices." (*Id.* ¶ 125.) To have standing for injunctive relief, plaintiff must allege that her risk of harm is sufficiently real, imminent, and substantial to warrant prophylactic measures. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Chapman v. Pier I 1mps. (U.S.), Inc.*, 631 F.3d 939, 946 (9th Cir. 2011); *see also Rahman v. Mott's LLP*, 2014 WL 325241 *1, *10 (N.D. Cal. Jan. 24, 2014) (applying *City of Los Angeles* and *Chapman*

---

[8] It is unclear whether plaintiff intends this language to mean she is entitled to the $50 proceeds she paid Natera under protest for the test or for some other amount.

[9] While plaintiff suggests she would not have undergone the test at all had she known more information about the costs associated with the test and therefore that *any* proceeds received by Natera ought to be returned to her as restitution, this argument is undermined by the Court's finding, *supra*, that plaintiff has not sufficiently plead reliance on Natera's direct or indirect representations about the price of their genetic tests.

[10] To the extent plaintiff standing theory rests on the notion that Natera possesses a "receivable asset" worth $721.10, the argument fails as conclusory, at best. Bald factual pleadings are insufficient. Plaintiff alleges no factual basis for a receiveable. First, Natera has made no recent attempt to collect any debt from Copley. Second, she has not pled the existence of any agreement obligating herself to pay Natera and which could potentially give rise to the existence of a "receivable asset." Third, Copley has cited no controlling case law to support her theory. The theory is too speculative to credit.

United States District Court
Northern District of California

to hold, in a consumer class action, that plaintiff must allege their intention to purchase the at-issue product again to be conferred standing for injunctive relief relating to the product).[11] It appears plaintiff seeks to satisfy this threshold by asserting that she "is *open to a future* pregnancy," and by further explaining that "if she were to become pregnant again, she would choose to undergo genetic testing to ensure her child's health, *including Natera testing if appropriate*, but only if she could be sure of the price of the test." (SAC ¶ 62 (emphasis supplied).) This argument fails to persuade. Plaintiff does not allege that she plans to become pregnant, is currently pregnant, or seeks to become pregnant.[12] Even if she planned to become pregnant, she does not explicitly plead that she would pursue genetic testing through Natera as part of her prenatal care. Plaintiff's factual allegations amount to speculation about a hypothetical future in which she may become pregnant and may find Natera's genetic testing offerings appropriate. Her allegations therefore fall short of imminent, real, and substantial risk of harm threshold.

---

[11] Plaintiff invites the Court to view the Ninth Circuit's decision in *Davidson* as a refinement of the *City of Los Angeles* standard that cuts against defendant. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018). She writes, the "Ninth Circuit has held that consumers who were previously deceived by a defendant's misrepresentations ***may*** have standing to seek to enjoin those misrepresentations." Opp. at 21:27-28 (citation omitted) (emphasis supplied). Plaintiff contends that *Davidson* stands, in part, for the proposition that, "for purposes of injunctive relief, the 'threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to,' or 'may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved'"). *Id.* at 22:4-9 (quoting 889 F.3d at 969-70). This may be so, but the facts in *Davidson* are distinguishable. There, plaintiff alleged "she continue[d] to desire" the product in question, "regularly visit[ed] stores . . . where [the product] [was] sold," and "[was] continually presented with [the product]." 889 F.3d at 970 (internal quotations omitted). Here, plaintiff has not plead she is similarly likely to encounter, whether intentionally or unintentionally, defendant Natera's genetic test in the future.

[12] The Court acknowledges plaintiff's argument that, the "reality of family planning is that Plaintiff does not know if, or when, she will ever become pregnant again, and so cannot plead any specific likelihood of encountering Defendant's conduct again." Opp. at 22:15-17. To be clear, the Court does not suggest plaintiff must allege with specificity when (if ever) she will become pregnant again. The Court merely finds that plaintiff's allegations that she is merely "open" to the possibility of a future pregnancy, without more, does not confer her standing to pursue the injunctive relief she seeks in an Article III court.

United States District Court
Northern District of California

Plaintiff also appears to recast her core argument about injunctive relief, described above, to fashion two secondary arguments in support of her Article III standing. The Court addresses each. *First*, plaintiff argues she has Article III standing to seek injunctive relief relating to the potential future collection of her unpaid debt to Natera.[13] In support, plaintiff cites two district court cases from Texas: *Riley* and its progeny *Mock*. *See Riley v. Hous. Northwest Operating Co., LLC*, 2020 U.S. Dist. LEXIS 102697 (S.D. Tex. June 11, 2020); *Mock v. St. David's Healthcare P'ship, L.P., LLP*, 2020 U.S. Dist. LEXIS 160796 (W.D. Tex. Sept. 2, 2020). The court in *Riley* determined a putative class action plaintiff had Article III standing to seek injunctive relief enjoining the collection of medical debt. 2020 U.S. Dist. LEXIS 102697 at *2-*4, *14. *Riley* is distinguishable. There, plaintiff had signed a contract creating an enforceable obligation to pay a medical debt, and the resulting bill, having not been paid by plaintiff, was sent to a collections agency that had contacted plaintiff to obtain payment. *Id.* at *3. Here, plaintiff concedes no such contract has been executed and does not allege defendant has made any attempt to refer the balance of her bill to a collections agency or otherwise sought payment of the balance since 2021. The Court therefore declines to follow *Riley*.

*Second*, plaintiff argues she has Article III standing to seek injunctive relief because "th[is] case satisfies the 'capable of repetition yet evading review' exception to ordinary Article III ***standing*** requirements." Opp. at 22:10-12 (emphasis supplied). She is mistaken. That exception is to the ***mootness*** doctrine, which the Court need not consider here as the Article III standing analysis is dispositive. *See Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985) (noting that "[a]n exception to the mootness doctrine is recognized . . . in those actions that are 'capable of repetition, yet evading review'" and is applied in certain narrow circumstances) (quoting *Trustees for Alaska v. Environmental Protection Agency*, 749 F.2d 549, 555 (9th Cir. 1984)).

In sum, plaintiff has not pled sufficient facts to establish Article III standing for the

[13] *See* Opp. at 21:15-17 ("If Plaintiff prevails, one appropriate form of relief may be an injunction requiring Defendant to cancel its bills, or prohibiting Defendant from further attempts to collect on its bills.").

United States District Court
Northern District of California

equitable remedies or relief she seeks.[14] The Court therefore lacks jurisdiction over not only her but the members of the putative class. *Frank v. Gaos*, 139 S.Ct. 1041, 1046 (2019) ("F]ederal courts lack jurisdiction [over the putative class] if no named plaintiff has standing.").

## IV. CONCLUSION

For the foregoing reasons, this case is **DISMISSED WITHOUT PREJUDICE** to be filed in state court. The Court makes no findings with respect to plaintiff's state statutory standing, as plaintiff's lack of Article III is dispositive.

This terminates docket number 57.

The clerk is directed to close the case.

**IT IS SO ORDERED.**

Dated: May 8, 2023

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

[14] Since the Court finds plaintiff lacks Article III standing for her UCL and CLRA claims as well as for the equitable remedies and relief she seeks, the Court does not reach plaintiff's claims for punitive damages, pre-judgment and post-judgment interest, costs, or attorney fees, which are contingent upon judgment in her favor on the merits.